UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-4420
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KERMIT A. DOUCET,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____
(June 16, 1993)


Before REYNALDO G. GARZA, WILLIAMS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A jury found Kermit Doucet guilty of one count of possession of an unregistered firearm modified to fire as a machine gun in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Doucet appeals the verdict. We reverse and remand.

**I**

In 1983 Doucet bought an AR-15 semi-automatic rifle and a "sear" that would allow it to be converted into an automatic rifle. The gun dealer gave Doucet the Treasury Department forms advising him that if the gun was to be used as an automatic it would have to be registered and applicable taxes would have to be paid. Shortly after the purchase Doucet tried the gun using the

sear but found that it constantly jammed. A friend of Doucet's placed a copper shim in the rifle that made it work better with the sear. However, Doucet said he never used the gun again as an automatic and never again put the sear into it.

In 1989, James Doucet, Kermit's brother, borrowed money from Kermit. After a year passed James had still not paid the money back to Kermit. When Kermit demanded the money and threatened to seize some collateral, James resisted and became upset.

On October 3, 1990, James approached agents of the Bureau of Alcohol, Tobacco and Firearms to tell them that his brother, Kermit, possessed an unregistered fully automatic assault rifle. The ATF equipped James with a telephone recording device and instructed him to contact his brother about the rifle. On October 14, James contacted Kermit and they discussed the machine gun. In the conversation Kermit described the location "where [he] usually go[es] to shoot it" as "extremely remote" and as "safe to shoot it." He also said the rifle was "ready to go" and said that it "don't jam."

On October 18, James again contacted Kermit to see if he could borrow the gun. Once again, the ATF wired James to record the conversation. Kermit demonstrated how to load and operate the machine gun and explained how the sear makes the AR-15 fully automatic. Kermit told James "This is against the law" and in describing the advantage of the sear he remarked that if someone comes along, "Pop that thing and throw the sear away, you'll be

legal . . . that's what makes it awesome." Kermit gave James several magazine clips and a thousand rounds of ammunition. Kermit's brief contends that the recorded conversation also reveals that he had trouble getting the sear into the rifle, showing his unfamiliarity with the way the device works.

James left and surrendered the weapon to ATF agents. A grand jury initially indicted Kermit on a three-count indictment charging him with 1) possession of a firearm that had been modified to fire as a machine gun, 2) possession of an unregistered firearm modified to fire as a machine gun, and 3) transferring a firearm modified to fire as a machine gun. Counts one and three were subsequently dropped and Doucet was tried before a jury on only the count charging possession of an unregistered firearm modified to fire as a machine gun. The jury found Doucet guilty. The district court sentenced him to twelve months of unsupervised probation and a $5,000.00 fine.

**II**

At trial, Doucet admitted that he had modified the weapon for his brother's use as charged in the indictment but maintained that he had no predisposition to modify the weapon. He claimed that the evidence showed that he had never used the weapon as an automatic, that it had stayed in a gun cabinet for years, with the sear in a separate closet, and that he inserted the sear only at his brother's request and with great difficulty. Thus, he said he had been entrapped.

3

Doucet argues that on the last day of trial the government realized it was going to lose, so it changed its theory of the case. Under the new theory, Doucet could be convicted for mere possession of the unregistered, unassembled component parts of a machine gun, even though he had been indicted for possession of an unregistered firearm already modified to serve as a machine gun. This new "indictment" would avoid Doucet's entrapment defense because it did not depend on Doucet's assembling the machine gun at his brother's prodding.

Doucet says this change in theory was manifested in two ways. First, Doucet points to the disparity between the theory of the case propounded in the government's opening argument and the theory offered in its closing argument. In its opening argument, the government emphasized Doucet's actions in putting the sear into the AR-15 on October 18, 1990--this act constituted the "possession" for which Doucet was charged. The government never made mention of Doucet's possession of the unassembled component parts for several years as a basis for the conviction. In closing argument, however, the government's counsel repeatedly emphasized the fact that Doucet had possessed the unassembled parts of the AR-15 for several years. The prosecutor told the jury:

> The next question we've got to ask is whether he possessed a machine gun, and I told you before, I believe the judge is going to instruct you as to the law. What a machine gun is is this. A machine gun is either a weapon that shoots fully automatic, or if you have a weapon and you have other pieces that you can put in the weapon and make them shoot fully automatic, then you possess--or that's a machine gun. I believe that's what the judge is going to instruct you as to the law, and

4

listen carefully when he instructs you. He [Doucet] possessed an unregistered machine gun.

The prosecutor added:

> [W]e can show that he [Doucet] did possess it [the machine gun]. We can show that with evidence, and we can show that it was unregistered. We showed it with evidence, and we can show that it was a machine gun, and we showed that with evidence. <u>We have shown that from March 5th of 1983 until October 18th of 1990 he possessed an unregistered machine gun</u>.

Finally, in his rebuttal to Doucet's claims of entrapment, the prosecutor offered this:

> Well, I told you what a firearm is, and the judge is going to tell you. I accept that burden because there's no evidence that a government agent came in and made him possess an unregistered firearm. He'd been possessing the thing since 1983. <u>If he's got the parts--based on what the law says that the judge is going to instruct you on, I believe, he had the parts, and the parts are the firearm itself, so there's no question that he possessed an unregistered firearm</u> because he didn't register it by his own words. No question.

Second, the government gave the district court a supplemental jury instruction on the last day of trial before the last defense witness was to testify. That jury instruction defines "machine gun" almost exactly as it appears in the National Firearms Act, 26 U.S.C. § 5845(b):

> A machine gun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger. <u>The term machine gun shall also include any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person</u>.

(emphasis added). Thus, possession of the unassembled parts of a machine gun would qualify as possession of a "machine gun" under the definition. The definition was not included in the

5

government's original list of requested charges submitted prior to trial.

Doucet argues that the effect of the instruction containing the definition of a machine gun and the government's closing argument was to permit the jury to convict him for mere possession of the unregistered component parts of a machine gun, rather than for the offense for which he was indicted: possession of an unregistered assembled machine gun. This amounts, he contends, either to a per se reversible amendment in the indictment or a prejudicial variance between the proof offered at trial and the indictment, citing United States v. Salinas, 654 F.2d 319 (5th Cir. 1981).

The government responds that Doucet was indicted and convicted for the same offense: possession of an unregistered assembled machine gun. It says that there was no possibility that the jury was confused about what it was convicting Doucet for because the trial judge clearly laid out the elements of the offense. The trial court instructed the jury that it could find Doucet guilty only if he knew he had a "gun" in his possession; the gun was modified to fire as a machine gun; and he knew the weapon's characteristics and that it was a fully automatic weapon. Thus, according to the elements of the offense, Doucet could only be convicted for possessing an unregistered assembled machine gun. The government concludes--without argument or explanation--that the instruction regarding the definition of a machine gun did not broaden the possible basis for conviction. Further, the government

6

does not address the significance of the prosecutor's closing argument in light of the late-added jury charge.

### III

The Fifth Amendment provides for criminal prosecution only on the basis of a grand jury indictment. Only the grand jury can amend an indictment to broaden it. Stirone v. United States, 361 U.S. 212, 215-16, 80 S. Ct. 270 (1960). The amendment need not be explicit to constitute reversible error, but may be implicit or constructive. This occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. United States v. Baytank, 934 F.2d 599, 606 (5th Cir. 1991). Constructive amendment requires reversal of the conviction. Id. Moreover, it is clear that the indictment may be amended constructively by the actions of either the court or the prosecutor. Salinas, 654 F.2d at 324.

This Court faced a situation analogous to the instant one in United States v. Beard, 436 F.2d 1084 (5th Cir. 1971). There the government indicted the defendant under an embezzlement statute. During trial the government realized that while the facts developed did not charge a violation of the particular statute cited in the indictment, they did charge a violation of a similar statute not named in the indictment. Consequently, the government urged conviction under the original indictment for violation of the new statute. Id. at 1086. In reversing the conviction for constructive amendment of the indictment, this Court noted:

> Permission was not asked of or given by the trial judge for formal amendment of the indictment, but nevertheless

7

> the indictment was in effect amended by the government's change in position during the course of the trial when the fatal defects in the proof came to light . . . .

Id. at 1087 (emphasis added). Although Beard involved an effective amendment of the indictment to charge an offense under a statute different from the one cited in the indictment, its logic applies where the effective amendment is to change the theory under which the government is pursuing conviction for violation of the same statute. Either way, the defendant is not apprised by the indictment of the particular theory he will have to counter at trial and the jury is permitted to convict on a basis broader than that charged in the grand jury's indictment. See also United States v. Salinas, 654 F.2d 319, 323-24 (5th Cir. 1981).

More importantly, Beard recognizes that the government's change in position during the trial can be sufficient to work a constructive amendment of the indictment even where the court does not formally alter the elements of the offense in the jury charge. The only question, then, is whether the government changed its theory during the trial so as to urge the jury to convict on a basis broader than that charged in the indictment.

There can be no doubt, and the government does not argue to the contrary, that the indictment charged Doucet with possession of an unregistered assembled machine gun. Possession of the unassembled component parts of that gun would be insufficient to convict him under the original indictment, as the government must concede. Indeed, the government's opening argument plainly indicated that the government would prove only that Doucet

8

possessed the assembled machine gun. The original jury instruction submitted by the government did not include the expansive definition of a machine gun the government later offered. Doucet accordingly prepared his defense to the charge that he had possessed an assembled automatic weapon.

By the last day of the trial, the direction of the government's prosecution had changed. On that day it first offered its supplemental jury instruction--to which Doucet objected--that included the definition of a machine gun. The jury charge defines "machine gun" to include its unassembled component parts. Based on that definition a reasonable jury could conclude that a "machine gun" could be the unassembled parts Doucet had possessed since 1983. That conclusion was fortified by the prosecutor's repeated claims in closing argument that "he [Doucet] had the parts, and the parts are the firearm itself." The prosecutor compounded the error in these claims by referring the jury each time to the jury charge containing the new definition of a machine gun. The prosecutor thus invited the jury to convict Doucet of a crime for which he was never indicted: possession of the unassembled parts of a machine gun. That blatant invitation differed materially from what the original indictment called on the jury to do and seriously undercut the defense that Doucet had prepared in response to the original terms of the prosecution. It was, therefore, a constructive amendment to the indictment.

Doucet argues also that because the district court's jury charge permitted him to be convicted for mere possession of an

9

unassembled machine gun, he did not have the requisite mens rea to be found guilty. Specifically, he claims that he never knew that Congress had amended the law to provide for registration of an unassembled machine gun, citing Lambert v. California, 355 U.S. 225, 78 S. Ct. 240 (1957). It is unnecessary to address this contention since the conviction is reversed because of the constructive amendment to the indictment discussed above.

## IV

The government asserts in its brief that "[t]here is no possibility for the jury to have thought that mere possession of the sear only or of the two parts separately would have constituted the offense for which the defendant was indicted and for which he was tried." That claim flies in the face of the government's own closing argument and the jury charge the government submitted on the very last day of trial. The government here lured Doucet into constructing an entrapment defense against a charge that the government ultimately abandoned at trial in favor of a broader basis for conviction. But an indictment is not putty in the government's hands. Having used Doucet's own brother as an investigative arm of the ATF--itself a lamentable tactic that coldly exploits familial relationships--the government proceeded to play charades with his trial. Les jeux sont faits.

As noted above, a constructive amendment to an indictment requires reversal of the conviction. The conviction is reversed and remanded to the district court for further proceedings.

**REVERSED** and **REMANDED**.

10