**REVISED**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-30221

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SEBASTIAN SALVATORE, also known as Buster, also known as Harry,
ANTHONY JOSEPH TUSA, JR., also known as A.J.,
VICTOR JOSEPH TUSA, SR., also known as Vic,

Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana
April 14, 1997

Before DUHÉ, BENAVIDES, and STEWART, Circuit Judges.

DUHÉ, Circuit Judge:

Anthony Tusa, Victor Tusa, and Sebastian Salvatore appeal their convictions arising from their participation in a scheme to operate certain organized crime-controlled companies that circumvented the licensing requirements of Louisiana's Video Draw Poker Devices Control Law. For reasons that follow, we affirm.

BACKGROUND

In 1991, Louisiana enacted the "Video Draw Poker Devices Control Law" (hereinafter "the Video Poker Law" or "the Act"),

which legalized video poker machines in Louisiana subject to the terms of the Act. See La. R.S. 33:4862.1 et seq. (recodified at La. R.S. 27:301-:324 (West Supp. 1997)). To operate in the State, all video poker machine manufacturers, distributors, and owners must be licensed. See id. at 33:4862.11 (recodified at La. R.S. 27:311). To be licensed, each applicant must satisfy certain "suitability" criteria, which provide that no license will be issued to any person convicted of certain criminal offenses, and which require each applicant to be a person of good character who does not pose a threat to the public interest. See id. at 33:4862.10(A)-(B) (recodified at La. R.S. 27:310(A)-(B)). The Act also creates a continuing duty on the part of all licensees to inform the Video Gaming Division of the Louisiana State Police--the agency charged with overseeing the video poker industry--of any facts that they believe would be a violation of the Video Poker Law. See id. at 33:4862.10(C) (recodified at La. R.S. 27:310(C)).

The Appellants, and fourteen co-defendants, were indicted for operating a criminal enterprise that subverted the licensing requirements of Louisiana's Video Poker Law. The purpose of the enterprise was to own and operate organized crime-controlled companies engaged in the video poker industry. To this end, certain of the co-defendants known to be involved in organized crime conspired with apparently legitimate "front men" or "straw men," who obtained video poker licenses from Louisiana by intentionally concealing the presence of organized crime from the Video Gaming Division. Once established and licensed, these "front

2

companies" obtained funding and purchased video poker machines from Bally Gaming, Inc. ("Bally Gaming"), a licensed video poker machine manufacturer. Thereafter, the enterprise sought to "skim, divert, and steal" funds collected by these crime-controlled companies and to funnel such money to associates of New Orleans-based and New York-based organized crime families.

The heart of the Government's case-in-chief consisted of the testimony of Christopher Tanfield and FBI Agent Richard McHenry. Tanfield, a cooperating co-defendant, provided an inside view of the business side of the criminal enterprise. Agent McHenry, the primary case agent, testified to the meaning of numerous conversations and the identity of individuals covertly recorded by an FBI microphone, telephone wiretap, and video camera, all hidden inside Frank's Deli on Decatur Street, a primary meeting spot of the conspirators.

Tanfield testified that he and Steven Bolson, another co-defendant who pleaded guilty, incorporated and operated two businesses known as Worldwide Gaming of Louisiana, Inc. ("Worldwide Gaming") and Louisiana Route Operators, Inc. ("LRO" or "Louisiana Route Operators"). Worldwide Gaming was licensed to sell and distribute video poker machines in Louisiana. LRO was licensed as a route operator company, meaning that it could own video poker machines, place the machines in businesses, and receive revenues from the operation of the machines. As apparently legitimate "front men," Tanfield and Bolson, initially designated as vice-president and president of Worldwide Gaming and LRO, respectively,

obtained licenses for these companies from the Video Gaming Division by deliberately concealing the fact that the companies were, in reality, fronts for organized crime. Tanfield described his dealings with individuals associated both with the New Orleans-based Marcello crime family, including Anthony Carollo (the "boss" of the family), Joseph Marcello, Jr., Frank Gagliano, Sr., Joseph Gagliano, and Sebastian Salvatore, and with the New York-based Gambino crime family, including Joseph Corozzo and John Gammarano. All of these individuals were co-defendants of the Appellants who pleaded guilty before the Appellants' trial.

Through Worldwide Gaming and LRO, Tanfield and Bolson operated under the direction of organized crime as wholesalers in the video poker industry. After buying video poker machines and borrowing money from Bally Gaming, Worldwide Gaming and LRO would then sell these machines to and participate in the routes of certain businesses in Louisiana. Money thus received by Worldwide Gaming and LRO was then funneled to organized crime. One of the businesses with which Tanfield dealt was Bayou Casino Inc. ("Bayou Casino"), the route operator company owned and operated by Victor and Anthony Tusa. As outlined below, Tanfield repeatedly inculpated the Tusas and Salvatore in the criminal enterprise.

Before trial, all of the indicted co-defendants, except for the three Appellants, pleaded guilty to various federal offenses. The Appellants proceeded to trial and were convicted. Anthony and Victor Tusa were each convicted of mail fraud, 18 U.S.C. § 1341 (counts 12-14). Sebastian Salvatore was found guilty of violating

the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 (count 1); conspiracy to violate the RICO Act, 18 U.S.C. § 1962 (count 2); mail fraud, 18 U.S.C. § 1341 (counts 3-7, 9-10); conducting an illegal gambling business, 18 U.S.C. §§ 1955 (counts 8, 11); wire fraud, 18 U.S.C. § 1343 (counts 16-31); and interstate travel and communication in aid of racketeering, 18 U.S.C. 1952 (count 37).  The Tusas were each sentenced to 10 months incarceration on all counts to run concurrently, and each was ordered to pay restitution of $37,048 and a fine of $11,838. Salvatore was sentenced to 18 months incarceration on all counts to run concurrently, and was ordered to pay restitution of $25,000.

**ANALYSIS**

I.   SUFFICIENCY OF THE EVIDENCE

  *A.   Standard of Review*

A criminal conviction must be upheld if any rational jury could have found that the evidence established the essential elements of the crimes charged beyond a reasonable doubt.  <u>See</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>United States v. Ismoila</u>, 100 F.3d 380, 387 (5th Cir. 1996).  We view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the jury verdict.  <u>See</u> <u>United States v. Resio-Trejo</u>, 45 F.3d 907, 910 (5th Cir. 1995).   The evidence need not exclude every reasonable hypothesis of innocence, <u>see</u> <u>United States v. McCord</u>, 33 F.3d 1434, 1439 (5th Cir. 1994), but if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of

5

innocence," the conviction must be reversed. <u>United States v. Salazar</u>, 66 F.3d 723, 728 (5th Cir. 1995).

*B.    The Tusas*

To sustain the Tusas' mail fraud convictions, the Government had to prove: (1) the existence of a scheme to defraud, (2) the use of the mails to execute the scheme, and (3) the specific intent on the part of the defendants to commit fraud. <u>See</u> <u>United States v. Fagan</u>, 821 F.2d 1002, 1008 (5th Cir. 1987). The Tusas assert that they were legitimate businessmen operating within the confines of the Video Poker Law, and they maintain that the Government did not establish that Bayou Casino was controlled by organized crime. Accordingly, they contend that the Government failed to establish that they had the specific intent to defraud. The Tusas repeatedly draw exculpatory inferences from the evidence purportedly showing that they operated a legitimate business, but we must accept all reasonable inferences in the light most favorable to the verdict. <u>See</u> <u>Resio-Trejo</u>, 45 F.3d at 910. Doing so, we conclude that the evidence was sufficient to support the Tusas' mail fraud convictions.

In establishing that Bayou Casino, the Tusas' video poker route operator company, was controlled by organized crime, the Government relied primarily upon the testimony of Christopher Tanfield and the audiotapes of numerous inculpatory conversations between the Tusas and other co-defendants recorded by the Government microphone and telephone wiretap hidden at Frank's Deli. Tanfield's testimony establishes that organized crime did have

6

significant control over Bayou Casino, and it is undisputed that the Tusas did not inform the Video Gaming Division of such control, as required by the Video Poker Law. Specifically, Tanfield testified that Joseph Marcello Jr. both instructed Tanfield to give the Tusas preferential treatment and also mediated disputes that arose between the Tusas and other companies involved in the enterprise. In addition, Tanfield testified that Bayou Casino eventually (in November 1992) became a front company for organized crime.

Tanfield's testimony was supported by the audiotaped conversations and FBI Agent Richard McHenry's testimony regarding those conversations. Although the actual text of the taped conversations was at times seemingly innocuous, Agent McHenry testified extensively as to the meaning of the conversations and "interpreted" them for the jury. The tapes, and Agent McHenry's testimony regarding the tapes, establish that the Tusas dealt extensively with Carollo, Marcello, and the Gaglianos; that the Tusas believed these people to be involved in the operation and control of Worldwide Gaming and LRO; and that Carollo, Marcello, and the Gaglianos had some degree of control over Bayou Casino. Although the tapes do not rule out the Tusas' contention that they engaged in arms-length, legitimate business negotiations with Tanfield, Bolson, Carollo, Marcello, and the Gaglianos, it is also reasonable to draw, as the jury did, more inculpatory inferences from the tapes. See McCord, 33 F.3d at 1439.

Upon reviewing the evidence in the light most favorable to the

verdict, we conclude that a reasonable jury could have believed that the Government proved beyond a reasonable doubt that the Tusas committed the essential elements of mail fraud.

   *C.   Salvatore*

Salvatore was convicted of RICO, RICO conspiracy, mail fraud, wire fraud, interstate travel and communication in aid of racketeering, and conducting an illegal gambling business. Salvatore assumes that his convictions on the substantive offenses were based upon co-conspirator liability under Pinkerton v. United States, 328 U.S. 640 (1946), and he therefore addresses the sufficiency of the evidence as it relates to his conviction for RICO conspiracy only.  Although Salvatore admits to attending meetings with the members of the Marcello crime family, he contends that the evidence regarding these meetings merely establishes his presence, and not his participation in the conspiracy.

To satisfy the intent requirement of conspiracy, the Government must prove that a defendant knew of the conspiracy and voluntarily joined it, and that a defendant had the requisite intent to commit the underlying substantive offenses.  See Ismoila, 100 F.3d at 387.  We will not readily infer a defendant's knowledge of and decision to join a conspiracy, and a defendant's mere association with a conspirator is not by itself sufficient to sustain a conspiracy conviction.  See United States v. Ross, 58 F.3d 154, 159 (5th Cir.), cert. denied, 116 S. Ct. 404 (1995).

As with the Tusas, much of the Government's proof is based upon the testimony of Christopher Tanfield.  Tanfield testified

8

that Salvatore was present, along with co-defendants Anthony Carollo, Joe Marcello, the Gaglianos, John Gammarano, and Joseph Corozzo, at a meeting in late 1991 in which the conspirators decided to allocate the profits from the video poker enterprise to the New York crime family, the New Orleans crime family, and to individuals such as Tanfield and Bolson to raise capital for the scheme.  Tanfield also testified that Salvatore was present at a December 1992 meeting where the conspirators discussed moving LRO's assets to other front companies to prevent Bally Gaming from foreclosing on LRO.

In addition, Tanfield described how money from Worldwide Gaming and LRO was to be shifted into offshore banks from which the conspirators, including Salvatore, could withdraw funds by means of debit cards so that the profits from Worldwide Gaming could be funneled to members of the conspiracy in a way that was non-traceable.  He testified that Joe Gagliano told him that Salvatore "was going to get a piece of the deal," meaning, in Tanfield's opinion, that Salvatore was "going to get one of these credit cards."

Agent McHenry's testimony concerning the audiotaped conversations bolstered Tanfield's inculpatory testimony regarding Salvatore's participation in the criminal enterprise.  Agent McHenry testified that the tapes reflected that after Anthony Carollo was hospitalized with a heart attack, John Gammarano decided that should anything further happen to Carollo, the conspirators should talk to either Joe Marcello or Sebastian

9

"Buster" Salvatore.  McHenry also testified that after Bally Gaming delivered the video poker machines to Worldwide Gaming, Salvatore and the other co-defendants were given a private tour of the Worldwide Gaming facility.

The Government also introduced a recording of a phone conversation between Joe Gagliano and Salvatore wherein Gagliano tells Salvatore, "They're here," and Salvatore responds, "All right. I'll be there in about 20 minutes."  Agent McHenry testified that the FBI's video surveillance reflected that this call was placed shortly after co-defendants Gammarano and Corozzo of the New York-based Gambino family arrived at Frank's Deli.  The tapes also reflect that, on at least three other occasions, Salvatore was informed that the conspirators were at the Deli and was told that his presence was requested there.  In addition, the jury heard a tape of a phone conversation between Carollo and Salvatore in which Carollo told Salvatore to meet him at an unnamed school, which Agent McHenry identified as the RETS Electronic Training Center in Metairie.   The FBI's videotape surveillance confirmed that Salvatore was present at RETS that evening for the meeting in which the conspirators, according to Tanfield, discussed hiding LRO's assets from Bally.

Agent McHenry also testified about a conversation recorded by the deli microphone wherein Salvatore was overheard discussing the scheme with his co-conspirators.  Finally, the deli microphone picked up a conversation in which  Joe Gagliano was describing to an unindicted co-conspirator an argument between Frank Gagliano Sr.

(Joe's father) and Sebastian Salvatore.  Referring to this conversation, Agent McHenry testified that  "Joe Gagliano is expressing his frustration because members of the family have been hustling and trying to get this thing going with Worldwide Gaming and LRO for a year now, and Mr. Salvatore, obviously he's going to get his piece of it, but he hasn't maybe been living up to his end on putting it all together for them."

In conclusion, the Government proved beyond a reasonable doubt that Salvatore knew of the conspiracy and voluntarily joined it. Although establishing that a defendant merely associated with the conspirators is insufficient to prove membership in a conspiracy, see United States v. Jackson, 700 F.2d 181, 185 (5th Cir. 1983), Salvatore's repeated and requested presence at meetings in which the details of the conspiracy were discussed does confirm that he knew of the conspiracy and voluntarily joined it.

II.  MAIL FRAUD

The indictment charged the Appellants with mail fraud for their participation in a scheme to defraud the State by fraudulently obtaining route operator and distributor licenses for their companies. The Appellants contend that their mail fraud convictions must be reversed because the video poker licenses do not constitute "money or property" as required by the mail fraud statute, 18 U.S.C. § 1341.  We review this issue of law *de novo*. See United States v. Loney, 959 F.2d 1332, 1334 (5th Cir. 1992). Whether video poker licenses are money or property for the purposes of the mail fraud statute is an issue of first impression in this

11

Circuit, and for reasons that follow, we conclude that video poker licenses do constitute money or property as required to support a mail fraud conviction.

The Supreme Court opinions in McNally v. United States, 483 U.S. 350 (1987), and Carpenter v. United States, 484 U.S. 19 (1987) guide our decision. In McNally, the defendants were convicted of mail fraud for their participation in a "self-dealing patronage scheme [that] defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." McNally, 483 U.S. at 352. The Supreme Court reversed the convictions, holding that although the mail fraud statute protects property rights, it "does not refer to the intangible right of the citizenry to good government." Id. at 356. The Court concluded that "any benefit which the Government derives from the [mail fraud] statute must be limited to the Government's interests as property holder." Id. at 358 n.8.

Shortly thereafter, the Supreme Court limited McNally, noting that the mail fraud statute protects intangible as well as tangible property rights. See Carpenter, 484 U.S. at 25. In Carpenter, the defendants, a Wall Street Journal columnist and a securities broker, were convicted of mail fraud arising from the pre-publication release of confidential business information to be published in the Journal's "Heard on the Street" column. See id. at 22-24. The Court affirmed the mail fraud convictions, holding that "[c]onfidential business information has long been recognized

12

as property," and that the defendants' scheme deprived the Journal of its intangible property right to keep the information confidential. See id. at 26-27.

Although neither McNally nor Carpenter directly answer the question at issue, they teach that: in considering whether video poker licenses constitute property under the mail fraud statute, we must determine whether Louisiana has an interest in the licenses as a property holder. Cf. McNally, 483 U.S. at 358 n.8.

Appellants rely upon a number of circuit court decisions holding that various state-issued licenses are not property for the purposes of the mail fraud statute. See United States v. Schwartz, 924 F.2d 410, 417-18 (2d Cir. 1991) (arms export license); United States v. Granberry, 908 F.2d 278, 280 (8th Cir. 1990) (school bus operator permit); United States v. Kato, 878 F.2d 267, 268-69 (9th Cir. 1989) (pilot license); Toulabi v. United States, 875 F.2d 122, 125 (7th Cir. 1989) (taxicab driver license); United States v. Murphy, 836 F.2d 248, 254 (6th Cir. 1988) (bingo license); United States v. Dadanian, 856 F.2d 1391, 1392 (9th Cir. 1988) (gambling license). All of these decisions are based on one or both of the following rationales: (1) although *issued* licenses constitute property in the hands of the licensees, *unissued* licenses in the hands of the licensor are not property; and (2) the government has only a *regulatory* interest, and not a *property* interest, in its issuance of the licenses.

In response, the Government references two circuit court decisions holding that certain licenses constitute property for the

13

purposes of the mail fraud statute. See United States v. Bucuvalas, 970 F.2d 937, 945 (1st Cir. 1992) (liquor license); United States v. Martinez, 905 F.2d 709, 715 (3d Cir. 1990) (medical license). Further, since this appeal was taken, another federal district court in Louisiana has held that video poker licences are property for purposes of the mail fraud statute. See United States v. Cleveland, 951 F. Supp. 1249, 1258 (E.D. La. 1997) (Vance, J.). These decisions all conclude that there is no relevant difference, for the purposes of the mail fraud statute, either between issued and unissued licenses, or between the government's regulatory interests and its property interests in the licenses at issue. We agree with the First and Third Circuits, and with Judges Clement and Vance of the Eastern District of Louisiana, that there is no justification for drawing a distinction between issued and unissued licenses, and we also agree that Louisiana has more than just a regulatory interest in the video poker licenses.

A.   The Legal "Bundle of Rights"

We begin with the proposition that the concept of property rights should be given a broad interpretation for the purposes of the mail fraud statute. See United States v. Loney, 959 F.2d 1332, 1336 (5th Cir. 1992); Murphy, 836 F.2d at 253. Indeed, this Court has noted that property may be defined as "something of value." See Loney, 959 F.2d at 1336 (citing McNally, 483 U.S. at 358). Supreme Court precedent also supports this view. See McNally, 483 U.S. at 356 (noting that the phrase, "any scheme or artifice to defraud," must be "interpreted broadly insofar as property rights

14

are concerned"); <u>Carpenter</u>, 484 U.S. at 26-27 (holding that the Wall Street Journal possessed a property right in the exclusivity of confidential business information).[1]

More specifically, courts define property as a legal "bundle of rights" that one possesses in connection with a particular object. See <u>Brotherton v. Cleveland</u>, 923 F.2d 477, 481 (9th Cir. 1991). Included in this bundle of property rights are the rights "to possess, use and dispose" of a particular article. See <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419, 435 (1982). Necessarily encompassed within the right to use and dispose of an object is the right to control that object--and in the case of licenses, the right to control their issuance. See <u>Bucuvalas</u>, 970 F.2d at 945 (noting that the city of Boston had a property right in its ability to control the issuance of liquor licenses). "When we say that we own something, one of the things that we mean is that we can determine what to do with it. We can either keep it or transfer it to someone else. And we can choose those persons to whom we will transfer it." <u>Granberry</u>, 908 F.2d at 280. Indeed, <u>Carpenter</u> itself supports the position that the right to control is included in the bundle of rights known as "property," for in that

---

[1]In addition, Congress narrowed the impact of <u>McNally</u> by enacting 18 U.S.C. § 1346, which provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' [a term found in § 1341] includes a scheme or artifice to deprive another of the intangible right of honest services." Although we do not affirm the Appellants' convictions on the grounds that they deprived Louisiana of its right to honest services, § 1346 is relevant because it evidences Congress's intent to define the reach of the mail and wire fraud statutes broadly. See <u>Cleveland</u>, 951 F. Supp. at 1259 n.6.

case the Supreme Court held that the defendants defrauded the Wall Street Journal of its right to control the disclosure of confidential business information.  See 484 U.S. at 28.

Louisiana's interest in video poker licenses fits squarely within the above interpretation of "property rights."  The Video Poker Law demonstrates that Louisiana zealously sought to protect its right to control the licenses.  In particular, the Act mandates that a person seeking to obtain a license must apply to the Video Gaming Division for approval and must meet certain "suitability" criteria set forth in the Act.  See La. R.S. 33:4862.10 (recodified at La. R.S. 27:310).  We see no relevant difference between the Wall Street Journal's right to restrict the pre-publication release of confidential business information and Louisiana's right to choose the persons to whom it issues video poker licenses.  As the Third Circuit noted in Martinez, 905 F.2d at 714, the Journal lost the intangible right to disseminate confidential information in the manner in which it pleased.  Similarly, because of the Appellants' fraudulent scheme, Louisiana was stripped of its right to bestow the video poker licenses on those parties meeting its criteria.

*B.    The Issued/Unissued Distinction*

Moreover, we are in full agreement with those courts that have found the distinction between issued and unissued licenses to be "esoteric."  See id.; Cleveland, 951 F. Supp. at 1261.  The courts that have embraced this distinction--and consequently have held that an unissued license is not property--provide no justification whatsoever for making the distinction.  See Granberry, 908 F.2d at

16

280; <u>Kato</u>, 878 F.2d at 269; <u>Murphy</u>, 836 F.2d at 253-54. It is perhaps true, as some other courts have surmised, that the issued-unissued distinction is based upon the reasoning that an issued license has great value in the hands of the licensee but an unissued license has negligible value in the hands of the government. <u>See</u>, <u>e.g.</u>, <u>Martinez</u>, 905 F.2d at 713; <u>Cleveland</u>, 951 F. Supp. at 1261. But, as do <u>Martinez</u> and <u>Cleveland</u>, we also reject this questionable logic.

First, the law of the Fifth Circuit "strongly suggests that the strained distinction between issued and unissued licenses should be rejected." <u>Cleveland</u>, 951 F. Supp. at 1261. In <u>Loney</u>, 959 F.2d at 1334, the defendants were convicted of wire fraud based upon a scheme to defraud American Airlines of frequent-flyer award coupons. We held that the award coupons--as owned by an airline--are property for purposes of the wire fraud statute, notwithstanding the fact that airlines cannot use the award coupons themselves and that the award coupons arguably have little monetary value to the airlines. <u>See</u> <u>id.</u> at 1336; <u>see</u> <u>also</u> <u>Cleveland</u>, 951 F. Supp. at 1261. We have thus refused to draw a distinction between issued and unissued frequent-flyer award coupons, and we likewise see no relevant distinction between issued and unissued video poker licenses.

Second, it is simply not the case that unissued video poker licenses have only negligible value to Louisiana. In the hands of the licensee, the license is "something of value," for it allows the licensee to operate the video poker machines and collect

17

significant revenue from their use; in the hands of Louisiana, the license has value both because (1) the State expects to collect an up-front fee (before issuance) and a percentage of net revenues (in the future) from the putative licensees and (2) the State values its rights to control the licenses and to choose the parties to whom it issues the licenses. The licensee and the licensor may value the video poker license differently; nevertheless, the license is valuable to both.

Third, as a number of courts have noted, the contention that "'licenses are property in the hands of the licensees, but never in the hands of the government represents an inversion of historical fact.'" Cleveland, 951 F. Supp. at 1261, (quoting United States v. Turoff, 701 F. Supp. 981, 989 (E.D.N.Y. 1988)); see also Martinez, 905 F.2d at 714. As noted by Professor Reich in his seminal article on property rights, a license is an example of government "largess" that "is originally public property, comes from the state, and may be withheld completely." Charles Reich, The New Property, 73 Yale L.J. 733, 778 (1964) (cited in Martinez, 905 F.2d at 714; Cleveland, 951 F. Supp. at 1261; Turoff, 701 F. Supp. at 989-90).

*C. The Regulatory Interest/Property Interest Distinction*

We are equally unimpressed with the argument that Louisiana has only a regulatory interest, and not a property interest, in the video poker licenses. Those courts articulating this distinction usually focus on the fact that the issuance of a license is nothing more than a physical manifestation of the government's intent to

18

regulate.  See Schwartz, 924 F.2d at 417 (arms export license); Toulabi, 875 F.2d at 125 (taxicab driver license).  In Schwartz, for example, the defendants were convicted of wire fraud for fraudulently obtaining arms export licences allowing them to sell certain munitions to foreign purchasers.  See Schwartz, 924 F.2d at 416.  In holding that such licenses do not constitute money or property under the mail fraud statute, the Second Circuit focused on the fact that it was merely fortuitous that the government chose to regulate arms sales by means of a license as opposed to a less formal symbol of government regulation.  See id. at 417.  That court stated:

> [T]he government's power to regulate does not *a fortiori* endow it with a property interest in the license; that is, the mere issuance of a document designed to formalize the government's regulation does not thereby create a property interest for the government.

Id.

The Second Circuit's logic, however, is not instructive in the instant case because of the difference between video poker licenses and arms export licenses.  Unlike the arms export license analyzed in Schwartz, a video poker license does not merely signify government approval of an individual's right to take part in a particular regulated industry; it also evinces the State's intent to participate in that industry.

We agree, as an initial matter, that the right to regulate a particular industry does not *a fortiori* give the regulator a property interest in licenses signifying the government's regulation.  Rather, a state's property interest in its licenses

19

derives at least in part from the character of the licenses themselves. The issuance of the video poker licenses signifies not only that the licensee is eligible to participate in Louisiana's regulated video poker industry, but also defines the licensee's legitimate participation in an enterprise from which Louisiana derives significant revenues. "One of the main reasons for the recent legalization of video poker was that it was considered an ongoing source of revenue for the State." Cleveland, 951 F. Supp. at 1262. As such, the Video Poker Act requires the licensees to pay a significant, up-front fee for their licenses and also to deposit 22.5% of their net revenues into the state treasury as a franchise fee. La. R.S. 33:4862.11 (recodified at La. R.S. 27:311). Simply put, Louisiana has much more than a regulatory interest in the video poker licenses; it has a direct and significant financial stake in its role as issuer of the licenses.[2]

---

[2]The facts and reasoning of Toulabi, 875 F.2d at 125, also illustrate why video poker licenses are different than other types of licenses. In that case, the Seventh Circuit held that taxicab driver licenses are not money or property under the mail fraud statute: "From the government's perspective, however, the license is a promise not to interfere rather than a sliver of property." See id. Indeed, in Chicago, a putative cab driver may obtain a license by paying a minimal fee of $50 and by passing a local geography test. It is not difficult to see why the Toulabi court reasoned that a cab driver license is a manifestation of the government's regulatory power: once an applicant shows that he is capable of navigating the streets of Chicago, the city will issue a license to him and promise not to interfere. In Louisiana, however, the State has a significant financial stake in the video poker industry, and once the licenses are issued, the State continues to "interfere" with the licensees in the sense that it receives 22.5% of each licensee's net revenues.
    The Seventh Circuit itself distinguished Toulabi when it held that a defendant may be convicted under the mail fraud statute for fraudulently obtaining a cable television franchise. See Borre v. United States, 940 F.2d 215, 221 (7th Cir. 1991). That court

20

*D.    The Louisiana Statute*

Finally, the Appellants contend that the Video Poker Law itself illustrates that the State has no property interest in the video poker licenses:

> Any license applied for, granted, or issued under the provisions of this Chapter is a pure and absolute privilege, and the awarding, denial, or withdrawal of which is solely within the discretion of the division and, except as provided in this Chapter, without recourse at law. *Any license issued or renewed under the provisions of this Chapter is not property or a protected interest under the constitutions of either the United States or the state of Louisiana.*

La. R.S. 33:4862.1(D) (recodified at La. R.S. 27:301(D)) (emphasis added).  We reject the Appellants' contention for a number of reasons.

First, this subsection does not speak to whether video poker licenses constitute a property interest of the State of Louisiana.  Read as a whole, this subsection instead demonstrates that it was Louisiana's intent to circumscribe the property rights of the licensees, but not such rights of the State itself.  Indeed, the first sentence of this subsection states that the "division," *i.e.*, the Video Gaming Division of the Louisiana State Police, has the discretion to award, deny, or withdraw the licenses.  We conclude that the Louisiana legislature sought, by means of this section, to

---

stated, "a cable television franchise represents far more than a mere 'promise not to interfere' by the government." Id. (quoting Toulabi, 875 F.2d at 125).  While we recognize that there are differences between fraudulently obtaining a video poker license and fraudulently obtaining a television franchise, we believe that video poker licenses (signifying the right to participate in the video poker industry) are much more analogous to the right to operate a television franchise than they are to the right to drive a taxicab.

21

maintain its own control and ownership of the video poker licenses, and we are in full agreement with the <u>Cleveland</u> court that section 4862.1(D) evinces the Louisiana legislature's intent to strengthen its own property interest in the licenses by limiting the property rights of the licensees.  See <u>Cleveland</u>, 951 F. Supp. at 1263.

Second, even assuming, *arguendo*, that section 4862.1(D) limits the State's property right in the video poker licenses, we are not bound by that limitation for purposes of the federal mail fraud statute.  Congress certainly could have defined property solely by reference to state law, but it chose not to do so in § 1341.  Thus, we agree with the district court that when determining whether something is "property" for purposes of the federal mail fraud statute, it is appropriate to look not only to state statutes but also to "traditional property law."  See <u>Carpenter</u>, 484 U.S. at 26 (noting that confidential business information "has long been recognized" as property, and citing 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1 at 260 (rev. ed. 1986)); <u>Martinez</u>, 905 F.2d at 713 (referring to the "traditional property law" of Pennsylvania).  Under traditional property law, licensees have a protected property interest.  See <u>Martinez</u>, 905 F.2d at 713 (citing <u>Mackey v. Montrym</u>, 443 U.S. 1, 10 (1979); <u>Beauchamp v. De Abadia</u>, 779 F.2d 773, 775 (1st Cir. 1985); <u>Keney v. Derbyshire</u>, 718 F.2d 352, 354 (10th Cir. 1983)); <u>Cleveland</u>, 951 F. Supp. at 1263. The Louisiana legislature--despite section 4862.1(D)--itself recognized that video poker licensees have at least some property rights in the video poker licenses, for it legislated that a person

22

whose license is suspended or revoked has the right to a hearing before the Video Gaming Division and the right to appeal the decision of the Division to a particular Louisiana court. See La. R.S. 33:4862.10(E) (recodified at La. R.S. 27:310(E)).

For the foregoing reasons, we hold that video poker licenses constitute money or property as required by the mail fraud statute.

III. ANONYMOUS JURY

The Appellants also challenge the district court's decision to empanel an anonymous jury. A district court's decision to use an anonymous jury is entitled to significant deference, and we review only for abuse of discretion. See United States v. Sanchez, 74 F.3d 562, 564 (5th Cir. 1996); United States v. Krout, 66 F.3d 1420, 1426 (5th Cir. 1995), cert. denied, 116 S. Ct. 963 (1996).

This Court has previously noted that empanelment of an anonymous jury is a "drastic measure" that should be utilized only in limited circumstances. See Krout, 66 F.3d at 1427. Accordingly, we have held that such a practice is constitutional when necessary "to ensure against a serious threat to juror safety" so long as the defendants are not stripped of their rights to conduct an effective voir dire and to maintain the presumption of innocence. See id. The district court must base its decision to empanel an anonymous jury "on more than mere allegations or inferences of potential risk." Id. In keeping with this concern, however, we will affirm the use of an anonymous jury when "the evidence at trial supports the conclusion that anonymity was warranted." Id.

23

Factors that may justify impanelment of an anonymous jury include:

> (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

Id. A district court may certainly consider evidence other than that relating to these five factors when deciding whether to empanel an anonymous jury, for the decision to do so should be based upon the "totality of the circumstances." See United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996) *cert. denied*, 1997 WL 188940, *cert. denied*, 1997 WL 188966, *cert. denied*, 1997 WL 188946, *cert. denied*, 1997 WL 189035 (Apr. 21, 1997).

Finally, we have also affirmed a district court's decision to empanel an anonymous jury when there is no showing that the use of an anonymous jury either prejudiced the defendant's ability to select an impartial jury or undermined the defendant's presumption of innocence. See id. at 724-25.

Turning to the totality of the circumstances in this case, we are convinced that the district court did not abuse its discretion in empaneling the anonymous jury. Salvatore and the Tusas were closely connected with organized crime; indeed, many of their co-defendants with ties to organized crime had already pleaded guilty. Moreover, this Court previously upheld the empanelment use of an anonymous jury in an earlier trial of Felix Riggio, one of the

24

Appellants' co-defendants, after determining that there had been specific death threats to witnesses in that case. See United States v. Riggio, 70 F.3d 336, 338 n.4, 339-40 (5th Cir. 1995), cert. denied, 116 S. Ct. 1366 (1996). Further, in one of the *in camera* hearings before the district court, the Government showed that the Manhattan District Attorneys' office was investigating whether co-defendant Joseph Corozzo had tampered with a juror in connection with his acquittal of criminal charges in New York. Although we note that Riggio and Corozzo pleaded guilty before trial, their involvement in the video poker conspiracy establishes that Appellants participated in a criminal enterprise and conspired with individuals having the capacity and willingness to interfere with the judicial process. Cf. Krout, 66 F.3d at 1427 n.7 (noting that specific evidence linking defendants to organized crime "alone can . . . translate into the requisite showing for the empanelment of an anonymous jury").

Even though the Appellants ultimately did not receive lengthy terms of imprisonment, they--especially Salvatore--initially faced potentially long sentences. Additionally, despite the fact that many of the co-conspirators had pleaded guilty, the publicity surrounding the trial was quite extensive, thus enhancing the possibility that the jurors' names would have become public.

Furthermore, none of the Appellants have pointed to any prejudice or adverse impact on their ability to conduct effective voir dire. The district court's procedures in empaneling the jury had only a minimal impact upon the case, as the court merely

25

substituted numbers for the jurors' names.  The court also allowed the Appellants extensive voir dire and furnished the Appellants with the results of detailed juror questionnaires.  Neither the information gleaned from these questionnaires nor the voir dire was deficient in any way, and therefore the district court adequately protected the Appellants' right to an effective voir dire.  See Branch, 91 F.3d at 724 (noting that defendants were not deprived of an effective voir dire when they were provided with the answers to detailed juror questionnaires).

Moreover, the district court's use of an anonymous jury did not frustrate the Appellants' presumption of innocence.  The court's instruction to the jury was a "plausible and nonprejudicial reason for not disclosing their identities" to either the Government or the defendants.  United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991).  The court explained that the case was a high profile one and that keeping the jurors' names confidential would protect them from unwanted phone calls:

> Now with any potentially high profile case, we're all subject to quack phone calls and anonymous letters and that sort of thing.  I want to protect the defendants as well as the government from any belief on any part of the jury that any such communications are coming from one side or the other.  In other words, I don't want the defendants to be characterized as anyone who would be sending anonymous communications to the jury; I don't want the government to be characterized as someone who is trying to influence the jury improperly.
> The use of an anonymous jury is to ensure that both sides will get a fair trial.  It's not being done because of any apprehension on the part of this court that you would be in danger or subject to improper pressures if your name had been disclosed.

Such an explanation is indeed plausible and nonprejudicial.  The

court's instruction comports fully with the Appellants' presumption of innocence and compares favorably with instructions approved in other anonymous jury cases. See Branch, 91 F.3d at 725; Riggio, 70 F.3d at 340 & n.23; United States v. Edmond, 52 F.3d 1080, 1093 (D.C. Cir.), cert. denied, 116 S. Ct. 539 (1995); United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989).

IV.  SEVERANCE

The Tusas present two reasons why the district court erred in denying their motion for severance.  First, they contend that they were forced to endure trial by an anonymous jury, which was necessary only because of Sebastian Salvatore.  Second, they claim that nearly the entire trial consisted of evidence irrelevant and highly prejudicial to them, *viz.*, evidence of mafia ties not implicating them.

We review for abuse of discretion.  United States v. Rocha, 916 F.2d 219, 227 (5th Cir. 1990).  "To demonstrate an abuse of discretion, a defendant must show that he suffered specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial."  Id.  A district court should grant a severance motion "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants."  United States v. Walters, 87 F.3d 663 (5th Cir.) (internal quotation marks omitted), cert. denied, 117 S. Ct. 498 (1996).

The Tusas' first argument is meritless because, as discussed above, empaneling the anonymous jury did not violate any of their

27

constitutional rights. The Tusas were part of the same criminal conspiracy as was Salvatore; the totality of the circumstances justify the court's decision to withhold the jurors' names and addresses from the parties; and the court's jury instructions ensured that the Tusas suffered no prejudice. The Tusas' second contention is likewise without merit because evidence of the criminal enterprise was relevant to their guilt, for they were charged with concealing criminal ties to their outwardly legitimate business.

V.    CONSTRUCTIVE AMENDMENT OF THE INDICTMENT

The Tusas also contend that their convictions must be reversed because the trial court allowed the Government to constructively amend its indictment. Alternatively, they maintain that the Government's proof constituted a prejudicial variance.

Only the grand jury can amend the indictment to broaden it. See United States v. Doucet, 994 F.2d 169, 172 (5th Cir. 1993). A constructive amendment of the indictment occurs when the Government changes "its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment." Id. A constructive amendment of the indictment can also occur if the Government is allowed to prove "an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment." United States v. Slovacek, 867 F.2d 842, 847 (5th Cir. 1989). Reversal is required when a conviction is based upon an indictment that has been constructively amended. See id.

A variance occurs where the evidence proves facts different

28

from those alleged in the indictment, but does not modify an essential element of the charged offense. See United States v. Puig-Infante, 19 F.3d 929, 935 (5th Cir. 1994). We review a variance under the harmless error standard, see Slovacek, 867 F.2d at 848, and we will reverse a conviction only upon a showing that the variance prejudiced the defendant's substantial rights. See Puig-Infante, 19 F.3d at 936. In determining whether a defendant has suffered prejudice, "our concern is that 'the indictment notifies a defendant adequately to permit him to prepare his defense, and does not leave the defendant vulnerable to a later prosecution because of failure to define the offense with particularity.'" Id. (quoting United States v. Hernandez, 962 F.2d 1152, 1159 (5th Cir. 1992)).

Counts 12-14 of the indictment charged that the Tusas and others devised a scheme to defraud the State of Louisiana by

> fraudulently obtaining state video poker route operator licenses for Bayou Casino, Inc. through intentionally concealing the involvement of organized crime . . . in Bayou Casino, Inc. as true owners, operators, and controllers of this video draw poker license-applicant route operator company.
>     In was a part of the scheme and artifice to defraud, that the defendants would use co-defendants A.J. Tusa and Vic Tusa as apparently legitimate "front men" or "straw men" in attempting to secure the electronic video gaming device licenses and mask the New Orleans organized crime family's hidden ownership interest in Bayou Casino, Inc. gaming operations.

The Tusas argue that during trial "the government abandoned the argument that the Tusas hid organized crime ownership of Bayou Casinos." Instead, the Tusas contend, the Government (1) presented evidence that the Tusas failed to disclose a contractual

relationship with Louisiana Route Operators, and (2) argued that the Tusas' failure to disclose the LRO contract was a violation of their "continuing duty" under the Video Poker Act to inform the Video Gaming Division of their business contacts.

We think that the evidence presented by the Government did not constructively amend the indictment or constitute a prejudicial variance because evidence of the Tusas' failure to disclose their contract with the mob-controlled LRO is an example of the concealment of mob interests charged in the indictment. The Tusas disagree, asserting that "the government did not argue that the existence of the LRO contract was evidence of the mob's secret ownership of Bayou Casinos. Rather, as stated by the government prosecutors, it was the failure to disclose the contract itself that became the subject of the mail fraud under the government's amended charge."

The Tusas' argument has little merit. The indictment charges that the Tusas concealed the involvement of organized crime in Bayou Casino. The record shows the same: Joseph Marcello, Jr. instructed Christopher Tanfield to give the Tusas preferential treatment; Marcello mediated disputes that arose between the Tusas and other video poker ventures; Anthony Carollo instructed Victor Tusa not to sign a particular business agreement; and the Marcello crime family contracted to receive 25% of Bayou Casino's profits through an arrangement with LRO. Although LRO's 25% interest in Bayou Casino is perhaps the most explicit documentary evidence of organized crime's significant control over Bayou Casino, it is by

30

no means the only evidence of such control. The Government's contention that the Tusas violated their "continuing duty" under state law is simply another way of proving that the Tusas concealed the mob's control of Bayou Casino.

VI.   CO-CONSPIRATOR STATEMENTS

Finally, the Tusas contend that the district court erred by admitting co-conspirator statements into evidence pursuant to Fed. R. Evid. 801(d)(2)(E). They also assert that, under United States v. James, 590 F.2d 575, 582 (5th Cir. 1979), the court should have required the Government to show, prior to admitting the declarations of the co-conspirators into evidence, that the Tusas were part of a conspiracy. We review for abuse of discretion. See United States v. Triplett, 922 F.2d 1174, 1180 (5th Cir. 1991).

A statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). By a preponderance of the evidence, the offering party must prove that there is a conspiracy involving the declarant and the nonoffering party and that the statement was made during the course and in furtherance of the conspiracy. See Triplett, 922 F.2d at 1181. To connect a defendant to a conspiracy, the Government must show that the defendant knew of the conspiracy and voluntarily joined it. See Ismoila, 100 F.3d at 387.

As we resolved above, the evidence establishes that there was a conspiracy, that the Tusas voluntarily joined it, and that the statements were made during the course and in furtherance of the

31

conspiracy. When reasonably practicable a district court should require a showing of a conspiracy and the defendants connection with it before admitting the statements of a co-conspirator. United States v. Fragoso, 978 F.2d 896, 900 (5th Cir. 1992); James, 590 F.2d at 582. Contrary to the Tusas' contention, however, the district court did in fact require the Government to submit evidence linking the Tusas to the charged conspiracy before it ruled, prior to trial, that the Government had "produced at least enough evidence to keep the issue open through trial." Although the court left open the possibility that it would reconsider its decision after hearing all the evidence, the court confirmed its determination at the close of the Government's case.

The record therefore supports not only the finding that the Tusas were linked to the conspiracy and that the statements were made during the course of and in furtherance of the conspiracy, but it also reflects that the court made a preliminary determination prior to trial that the co-conspirator statements were admissible. We therefore conclude that the district court did not abuse its discretion in admitting the co-conspirator statements into evidence pursuant to Fed. R. Evid. 801(d)(2)(E).

CONCLUSION

For the foregoing reasons, we affirm the Appellants' convictions on all counts.

AFFIRMED.