UNITED STATES of America

v.

Edwin EDWARDS, et al.

No. Crim.A. 98–165–B–M2.

United States District Court,
M.D. Louisiana.

July 27, 2000.

James B. Letten, Peter G. Strasser, Dept. of Justice, U.S. Atty.'s Office, New Orleans, LA, Michael William Manger, U.S. Atty.'s Office, E.D. La., New Orleans, Thomas L. Watson, Dept. of Justice, U.S. Attys. Office, New Orleans, LA, Eddie J. Jordan, Jr., U.S. Atty.'s Office, New Orleans, LA, Stephen A. Higginson, U.S. Atty.'s Office, E.D. La., New Orleans, LA, for U.S.

Richard G. Crane, Corrections & Sentencing Law, Nashville, TN, Daniel I. Small, Butters, Brazilian & Small, LLP, Boston, MA, for Edwin Edwards.

Edwin Edwards, Baton Rouge, LA, pro se.

Stephen Edwards, Baton Rouge, LA, pro se.

James M. Cole Bryan Cave LLP, Washington, DC, for Stephen Edwards.

Rebecca L. Hudsmith, Federal Public Defenders Office, Lafayette, LA, for Cecil Brown.

Servando C. Garcia, III, Ryan J. Roemershauser, Garcia & Bishop, Metairie, LA, William H. Jeffress, Jr., James R. Heavner, Jr., Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, for Andrew Martin.

James Michael Small, Law Offices of J. Michael Small, Alexandria, LA, for Bobby Johnson.

## RULING

POLOZOLA, Chief Judge.

The United States of America[1] filed a Motion for an Anonymous Jury in this case.[2] The defendants opposed the motion.[3] On January 7, 2000, the Court granted the government's motion.[4] The Court now assigns its reasons for granting the government's motion.

### BACKGROUND

The grand jury for the Middle District of Louisiana returned a 34–count indictment and later a superseding indictment against Edwin W. Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver, and Ecotry Fuller. This indictment charged, among other things, violations of Racketeer Influenced Corrupt Organization Act ("RICO"),[5] RICO conspiracy, mail and wire fraud, illegal wiretapping, money laundering and extortion. Because of the high media interest in this case, the Court issued a "gag order" on November 9, 1998[6] and February 9, 2000[7] in an attempt to control prejudicial statements made by the parties in this case and to ensure the parties would receive a fair trial with an impartial jury. The Court also issued a credentialing order for members of the media and another order allowing the press to have a place to conduct interviews outside of the federal courthouse.[8] To further ensure a fair and impartial jury which would not be subject to improper and prejudicial contact, influence, or harassment from the parties, the press and others, the Court granted the government's motion for an anonymous jury to the extent the Court withheld the

---

1. The United States of America will hereinafter sometimes be referred to as "the government" and "the United States."

2. Rec.Doc. No. 278.

3. Rec.Doc. No. 296.

4. Rec.Doc. No. 887.

5. 18 U.S.C. § 1961.

6. Rec.Doc. No. 3.

7. Rec.Doc. No. 1010.

8. Rec.Doc. Nos. 47 (Credentialing Order) and 292 (Media Bullpen Order).

names, addresses [9] and places of employment of the jurors from the parties, the media and the public. The Court now assigns reasons to support its decision.

## CONTENTIONS

The government requested an anonymous jury for the following reasons: (1) "Edwin Edwards is alleged to have been the central figure of an enterprise which corrupted a major industry in the State of Louisiana;" [10] (2) Edwin Edwards accomplished the alleged illegal acts "in large measure through the power of his elected office as governor;" [11] (3) Edwin Edwards and Stephen Edwards are charged with interfering with the lawful judicial process, specifically conspiring to obtain illegal wiretaps of the homes of FBI agents who were investigating their criminal activity; (4) Edwin Edwards is charged with interfering with the lawful judicial process, specifically attempting to bribe Judge Alfred Foster Sanders, III and offering to terminate a pending investigation being conducted by the United States Attorney for the Middle District of Louisiana; [12] (5) all defendants potentially face lengthy prison sentences; and (6) the potential for public-

ity and/or harassment of jurors due to the high level of media scrutiny. [13]

The defendants have filed an opposition to the motion for anonymous jury based on the following reasons: [14] (1) there is no evidence of any of the defendants being tied to "organized crime" in the traditional sense; (2) there is no evidence of physical harm present; (3) the defendants have not interfered with the judicial process; (4) the defendants would suffer prejudice if an anonymous jury is empaneled; and (5) there is a strong potential to adversely affect the exercise of their peremptory and cause challenges during voir dire. Defendants rely heavily on the factors enunciated in *United States v. Krout* [15] to support their arguments.

Oral argument was held on the motion on September 14, 16 and 17, 1999. The Court granted the motion and noted it would assign written reasons at a later date. These reasons now follow.

## LEGAL STANDARDS

The issue of whether a court may use an anonymous jury in the trial of a defendant

---

**9.** As will be noted later, while the Court did not give the specific street address, the Court did provide the parties with the juror's zip code and parish of residence.

**10.** Rec.Doc. No. 278.

**11.** Rec.Doc. No. 278.

**12.** These acts are alleged in the indictment filed in *United States v. James Brown, Alfred Foster Sanders, III, Edwin Washington Edwards, Robert Andre Bourgeois, David Judd Disiere, and Ronald R. Weems,* Cr–99–151 (M.D.La.). Alfred Foster Sanders, III and Robert Andre Bourgeois have entered guilty pleas in that case.

**13.** The government submitted the following affidavits in support of the motion for anonymous jury: (1) FBI Agent Dennis Horner; (2) FBI Agent Dennis Swikert; (3) Josephine Beninati, Financial Analyst with the FBI; (4) FBI Agent Theresa Hultz; (5) Supervising FBI Agent Geoffrey Santini; and (6) Sid Moreland. The government also submitted the following exhibits: (1) the factual basis underlying Dempsey White's plea agreement;

(2) an article which appeared in the Baton Rouge Advocate on July 2, 1999; (3) a transcript from a wiretap of a conversation between Constance A. Koury and Edwin Edwards; (4) an AP wire article dated January 17, 1986; (5) the indictment filed in *United States v. James Brown, et al;* and (6) the superseding bill of information and factual basis related to Judge Foster Sanders, who pled guilty in *United States v. James Brown, et al.*

**14.** The defendants submitted the following affidavits in opposition to the motion for anonymous jury: (1) Camille Gravel; (2) Evelyn Gravel; (3) Debbie Baer (two affidavits); (4) Mike Baer; (5) Ann Davenport; (6) Victor Bussie; (7) Fran Bussie; Susan McDuff Fontenot; (8) Edwin Edwards; and (9) Patrick Fanning. Defendants also submitted an excerpt from a conference in the chambers of Judge Vance in the matter of *United States v. Cleveland* on June 19, 1997, and statements made by Patrick Fanning in open court on September 17, 1999.

**15.** 66 F.3d 1420 (5th Cir.1995).

charged with a criminal offense is not a matter of first impression. The Fifth Circuit as well as other circuits have approved the use of an anonymous jury under certain circumstances. A review of the jurisprudence from the Fifth Circuit and the facts of this case support the Court's decision to use a partially anonymous jury herein. While the Court did grant the government's motion to use an anonymous jury in this case, the use of the term "anonymous" is very misleading. It is true the Court did not give the parties, the media or the public the names, addresses or places of employment of the jurors. However, the Court did provide all concerned with a voluminous amount of information about each juror. The Court used a 28–page questionnaire which was answered by each potential juror and consisted of 116 questions, some with numerous sub-parts.[16] In addition, the Court conducted an extensive voir dire of the potential jurors comprising approximately 2,000 pages of transcript. The parties were permitted to suggest questions and follow up questions to be asked of each juror. All of the parties had an exhaustive amount of knowledge about each juror which allowed each of them to make an informed decision on which jurors should be accepted, challenged for cause, or peremptorily challenged. The Court now turns to a discussion of the jurisprudence from the Fifth Circuit on this issue.

The Fifth Circuit Court of Appeals first addressed the issue of whether it was proper to have an anonymous jury in *United States v. Krout.*[17] In *Krout,* as in this case, the names, addresses, and places of employment of the jurors were withheld. Relying on jurisprudence from the Second Circuit, the Fifth Circuit set forth several

factors that may justify anonymity of a jury: (1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the capacity to harm jurors; (3) the defendant's past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.[18]

In *Krout,* the Fifth Circuit affirmed the trial court's decision to empanel an anonymous jury. The appellate court found that the district court's decision was supported by the evidence adduced at the trial and by the wiretap affidavits presented by the government. Additionally, the Fifth Circuit found that the "Texas Mexican Mafia" was an inherently dangerous organization. Since *Krout* was decided, a number of Fifth Circuit decisions have upheld use of anonymous juries under a variety of circumstances. A careful review of those cases is in order.

In *United States v. Riggio,*[19] the defendant was indicted for conspiracy to commit arson and use of fire to commit a federal felony. Concerned about possible jury tampering, the trial court assigned numbers to the jurors to assure anonymity. The trial court based its decision to use an anonymous jury on the following factors: (1) the record reflected that witnesses were allegedly threatened;[20] (2) the defendant had been accused of jury tampering in a previous case; and (3) there were alleged ties of the defendant to organized crime. In affirming the district court, the

---

**16.** A copy of the questionnaire used is attached as Appendix A to this opinion. The parties stipulated to the questions set forth in this questionnaire.

**17.** 66 F.3d at 1420.

**18.** *Krout,* 66 F.3d at 1427 (citations omitted).

**19.** 70 F.3d 336 (5th Cir.1995).

**20.** "The record reflects that witness A was told he would be a 'dead mother' if he cooperated, witness B was told Riggio would 'blow his brains out,' and witness C was told that the witnesses would become a part of 'history ... real quick.'" 70 F.3d at 338.

Fifth Circuit stated the following with respect to the propriety of empaneling an anonymous jury:

> In determining whether jurors need protection, the district court should consider the defendant's involvement in organized crime, his *past attempts at interfering with judicial proceedings*, his previous history of violence, the *extent of press coverage*, and the *likelihood of juror harassment or intimidation*.[21]

The Fifth Circuit also noted that Riggio had "committed fraud in order to serve on another jury, demonstrating a lack of respect for the judicial process and suggesting that he was capable of and willing to interfere with the jury system."[22] The Court also noted that "[t]he district court had a reasonable basis to conclude that similar threats and attempts at intimidation were likely to be made to the jurors if their identities were known."[23]

In *United States v. Branch*,[24] a trial involving the Branch Davidians, the district court sua sponte ordered the use of an anonymous jury. The Fifth Circuit upheld the trial court's decision. However, in doing so, the Fifth Circuit stated that referring to the jury as "anonymous" was misleading for the following reasons:

> Anonymity has long been an important element of our jury system. Jurors are randomly summoned from the community at large to decide the single case before them and, once done, to "inconspicuously fade back into the community." "Anonymous jury" has come to mean something different in recent years, signaling the district court's decision to withhold certain biographical information about potential jurors from the parties involved. That said, we should be wary of painting with too broad a brush. "Anonymous" juries include those about whom more has been concealed than here. The jurors here were not "anonymous" except in the most literal sense. The district court ordered only the jurors' names and addresses be withheld from the parties. Otherwise, the court provided the defendants with a wealth of information about the venire, including occupations and names of employers.[25]

Thus, the Fifth Circuit does not consider a district court's decision to withhold the names and addresses of the jurors to truly qualify the jury as "anonymous."

The *Branch* Court further stated that the trial court is required to "make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings."[26] In discussing the *Krout* factors, the Fifth Circuit stated that there was no intent to suggest that "these or some aggregate must be established on pain of reversal."[27] The Court stressed that district courts should look to the "totality of the circumstances."[28]

The trial court in *Branch* based its decision to withhold the names and addresses of the jurors on a number of factors. Specifically, the court found that an anonymous jury was proper "because of the 'enormous amount of world-wide attention' generated by the case and the emotionally charged atmosphere surrounding it. Not

**21.** *Riggio*, 70 F.3d at 339–340 (emphasis added) (citing *United States v. Paccione*, 949 F.2d 1183 (2nd Cir.1991)).

**22.** *Riggio*, 70 F.3d at 340, n. 21.

**23.** *Riggio*, 70 F.3d at 340, n. 22.

**24.** 91 F.3d 699 (5th Cir.1996), cert. denied, *Branch v. United States*, 520 U.S. 1185, 117 S.Ct. 1467, 137 L.Ed.2d 681 (1997).

**25.** *Branch*, 91 F.3d at 723 (citations omitted).

**26.** *Branch*, 91 F.3d at 723 (citing *United States v. Childress*, 58 F.3d 693, 702 (D.C.Cir. 1995), cert. denied, 516 U.S. 1098, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996)).

**27.** *Branch*, 91 F.3d at 724.

**28.** *Branch*, 91 F.3d at 724 (citing *United States v. Ross*, 33 F.3d 1507, 1521 (11th Cir. 1994)) (emphasis added).

all celebrated trials merit an anonymous jury, but '[t]he prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment.'" [29] Because the defendants in *Branch* were furnished with answers to eighty (80) detailed questions, the defendants' ability to select an impartial jury had not been prejudiced. The Court also emphasized that at voir dire, "the court asked the defendants' proposed questions and elicited additional information regarding potential juror bias." [30] In rejecting the defendants' assertion that their ability to select an impartial jury had been impaired, the court noted that defense counsel had available an "arsenal of information" about each prospective juror.

In *United States v. Sanchez*,[31] the trial court redacted certain identifying juror information because of a 10–day delay between jury selection and the commencement of the evidentiary phase of the trial and the potential fears of jurors in adjudicating the guilt or innocence of a "rogue" police officer. The Fifth Circuit reversed the district court's decision to empanel an anonymous jury, concluding that there was no evidence that the defendant had attempted to interfere with the judicial process or witnesses, and there was no indication that the jurors would be subjected to the type of extensive publicity that might bring about intimidation and harassment. The Court held that the district court's decision must rest on more than "mere allegations or inferences of potential risk." [32] Based upon the dearth of evidence supporting use of an anonymous jury in *Sanchez*, the Fifth Circuit held that the trial court abused its discretion.

The Fifth Circuit continued its evaluation of the use of anonymous juries in *United States v. Salvatore*[33] which involved seventeen defendants who were indicted for operating a criminal enterprise that subverted the licensing requirements of Louisiana's Video Poker Law, charges similar in nature to those contained in the present indictment. Fourteen of the seventeen defendants pled guilty prior to the trial. The district court empaneled an anonymous jury. The trial court found that *Salvatore* and the Tusas were closely connected with organized crime. The government also submitted evidence which showed that there was an ongoing investigation into possible jury tampering in connection with one defendant's acquittal of criminal charges in state court. Furthermore, there was evidence indicating that certain defendants showed a "willingness to interfere with the judicial process," [34] namely their guilty pleas to the video poker conspiracy. The Court also found that extensive publicity surrounding the trial "enhanc[ed] the possibility that the jurors' names would have become public." [35]

In affirming the trial court's decision to empanel an anonymous jury, the Fifth Circuit reiterated the factors previously set forth in *Krout* which may be considered by a trial judge. The Fifth Circuit also noted that a **"district court may certainly consider evidence other than that relating to these five factors** when deciding whether to empanel an anonymous jury, for the decision to do so should be based upon the 'totality of the circumstances.'" [36] Two of the defendants who had pled guilty in Salvatore also pled guilty to jury tam-

**29.** *Branch,* 91 F.3d at 724 (citations omitted) (emphasis added).

**30.** *Branch,* 91 F.3d at 725 (citing *United States v. Wong,* 40 F.3d 1347, 1377 (2nd Cir. 1994) (upholding anonymous jury where "extensive" voir dire adequately explored prospective juror bias)).

**31.** 74 F.3d 562 (5th Cir.1996).

**32.** *Sanchez,* 74 F.3d at 564 (citing *Krout,* 66 F.3d at 1427).

**33.** 110 F.3d 1131 (5th Cir.1997).

**34.** 110 F.3d at 1144.

**35.** 110 F.3d at 1144.

**36.** *Salvatore,* 110 F.3d at 1143 (citing *Branch,* 91 F.3d at 724 (emphasis added)).

pering in a prior case. The Fifth Circuit stated that the involvement of these two defendants in the video poker conspiracy "establishes that [the three] appellants participated in a criminal enterprise and conspired with individuals having the capacity and willingness to interfere with the judicial process." [37] Thus, a defendant's association with persons who have the capacity or willingness to interfere with the judicial process may be considered by the trial judge in determining whether to empanel an anonymous jury. [38] In addition to the fact that the three appellants in *Salvatore* were connected with organized crime, the Fifth Circuit noted the following upon review: (1) the defendants initially faced potentially long sentences; and (2) "the publicity surrounding the trial was quite extensive, thus enhancing the possibility that the jurors' names would have become public." [39]

While most of the Fifth Circuit cases in which anonymous juries were approved involved persons associated with organized crime (with the exception of *Branch* ), it is clear that this is *not* a required factor under the Fifth Circuit jurisprudence. The "organized crime factor" weighs heavily in favor of an anonymous jury, but it is only *one* of the numerous factors which may be considered based on the "totality of the circumstances" of the case. [40] In *Branch* and *Salvatore,* the Fifth Circuit discussed the factors enumerated in *Krout* and stressed that those factors were not the sole matters to be considered by the court in making its decision. In *Branch,* the Court, noted that "[o]ther circum-

stances may also justify [the use of an anonymous jury]. Indeed, while evidence that the defendant has in the past or intends in the future to tamper with the jury may be sufficient to warrant an anonymous jury, it is by no means necessary." [41] Thus, under Fifth Circuit jurisprudence, the analysis the Court must make in deciding whether to use an anonymous jury is fact intensive and depends upon the particular and total circumstances involved in the case. It is also clear that the use of an anonymous jury satisfies constitutional muster "when needed to ensure against a serious threat to juror safety provided the defendant's interest in the conduct of an effective voir dire of prospective jurors and the presumption of innocence are maintained." [42] A lower court's decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion of review. [43]

The Court now turns to a review of the evidence which supports the Court's decision to empanel an anonymous jury in this case.

## ANALYSIS

▆ It is clear from the Fifth Circuit jurisprudence that a trial court may consider various forms of evidence in deciding whether to empanel an anonymous jury. The list of factors set forth in *Krout* is not intended to be exhaustive. In fact, a court must look to the totality of the circumstances and may consider additional factors beyond those enumerated in *Krout.* The courts may receive evidence in camera and/or ex parte. [44] A motion for anony-

---

**37.** 110 F.3d at 1144.

**38.** Such is the case before the Court. A number of persons have pled guilty to related charges set forth in *United States v. Edwards* and *United States v. Brown.* These pleas clearly show an association with persons who have the capacity or willingness to interfere with witnesses or the judicial process.

**39.** *Salvatore,* 110 F.3d at 1145.

**40.** *See, Salvatore,* 110 F.3d at 1135 (citing *United States v. Branch,* 91 F.3d 699, 724).

**41.** *Branch,* 91 F.3d at 724 (citations omitted).

**42.** *Riggio,* 70 F.3d at 339.

**43.** *Krout,* 66 F.3d at 1426.

**44.** *See, United States v. Paccione,* 949 F.2d 1183 (2nd Cir.1991) (court considered affirmations received in camera, ex parte); *United States v. Salvatore,* 110 F.3d 1131 (5th Cir. 1997) (court considered evidence in camera; ex parte). While the Court did receive from the United States an affidavit which complained of an alleged threat signed by Sid

mous jury may also be determined by the trial court without any hearing on the matter.[45] The evidence presented to the Court in connection with the government's motion for anonymous jury, the testimony and exhibits presented during the course of the trial, matters pertaining to the jury which occurred during the trial, and extensive media attempts to contact the jurors during the trial clearly support the Court's decision to empanel an anonymous jury. There was also a serious concern on the part of some jurors about being identified during voir dire and after the trial. This important factor was considered by the Court and also supports the Court's decision herein.[46]

A review of this evidence is in order.

A number of factors weigh in favor of an anonymous jury in this case. First, the nature of the charges brought against Edwin and Stephen Edwards in this case and the nature of the charges brought against Edwin Edwards and others in *United States v. Brown* are indicative of attempts by Edwin Edwards and Stephen Edwards and others associated with them to interfere with the judicial process or witnesses. Edwin Edwards and Stephen Edwards are charged in Count 33 of the superseding indictment in this case with illegal wiretapping and counter surveillance of an FBI agent.[47] A co-defendant, Dempsey White, has already pled guilty to a crime relating to the allegations set forth in Count 33.[48] The other charges set forth in this indictment also show a pattern to disregard the judicial and administrative process established by the State of Louisiana for the proper selection of licenses to operate gaming riverboats in Louisiana.[49]

In the indictment returned against Edwin Edwards in *United States v. James Harvey Brown, et al.*, Edwin Edwards is charged with tampering with a witness pursuant to 18 U.S.C. § 1512(b)(3).[50] Judge Edith Brown Clement recently granted the government's motion for an anonymous jury in that case.[51]

Both the government and the defendants submitted evidence pertaining to matters involving jury selection and possible jury tampering in two earlier criminal

Moreland, the Court did not consider this information about an alleged threat in making its decision. During the trial, the Court ordered the United States to give a copy of the Moreland affidavit to the defendants while Moreland was testifying.

**45.** *Krout,* 66 F.3d at 1420 (no hearing held and the court relied upon unsworn affidavits); *United States v. Edmond,* 52 F.3d 1080 (D.C.Cir.1995) (sua sponte and without a hearing); *United States v. Eufrasio,* 935 F.2d 553 (3rd Cir.1991) (hearing not required as a matter of law, though it is a better practice to record findings and reasons when empaneling anonymous juries); *United States v. Wilson,* 160 F.3d 732 (D.C.Cir.1998) (evidentiary hearing was unnecessary where court relied upon the charges in the indictment and prosecutor's affidavit).

**46.** *See,* Rec.Doc. No. 1350 (Minute Entry which indicated nine of the eleven jurors did not want to be contacted by the press).

**47.** This charge was severed with the consent of all parties.

**48.** Dempsey White plead guilty to the offense of misprision of a felony relative to his failure to reveal the existence of these criminal acts to the authorities.

**49.** A number of persons plead guilty to these charges and testified at the trial.

**50.** The Court recused itself in the *Brown* case for reasons unrelated to this case. See Rec. Doc. Nos. 254, 261 (Cr–99–151). When ruling on the pending anonymous jury motion, the Court was not required to make credibility determinations of any potential witnesses in the *Brown* case. As noted elsewhere in this opinion, the Court is not required to look beyond the allegations of certain facts that, if true, would justify the impanelment of an anonymous jury. Even if the Court excludes the allegations against Edwin Edwards which are set forth in the indictment in *Brown,* an anonymous jury would still be warranted under the facts of this case. While the defendants have filed a motion to recuse this Court in this case because of its recusal in *Brown,* neither the law nor the evidence in this case requires recusal. See Rec.Doc. No. 1489.

**51.** Rec.Doc. No. 270 (Cr–99–151)

trials involving Edwin Edwards in the Eastern District of Louisiana in the 1980s. There are numerous affidavits presented from the current and former Commandants of the Louisiana State Police, attorneys in the former cases and others who may have been involved in the jury selection process. This Court does not believe it is necessary for the Court to determine with certainty whether all of the events which were alleged in these affidavits actually occurred. The potential for these events to have interfered with the judicial process is sufficient evidence for the Court to take into consideration, together with the other evidence in this case. Indeed, there was very credible evidence presented in the form of affidavits which suggest that the methods used to select jurors in the earlier cases had the potential to affect the judicial process in the earlier case.

The evidence presented during the course of the current trial also established that Andrew Martin had the potential for interfering with the judicial process. In a taped conversation which occurred in Edwin Edwards' office on January 9, 1997, Andrew Martin states that he has obtained a transcript of a wiretap from a "friend of a friend." [52] The transcript of this conversation,[53] which was played to the jury in connection with the Treasure Chest scheme provides:

[AM—Andrew Martin

EWE—Edwin W. Edwards]

AM: (UI). (Greetings in French)

EWE: (UI) what you got there?

(Rustling noises heard)

AM: You uh, see this? It's on the transcript of the wire tap for, from LARRY.

EWE: From LARRY?

AM: Yeah.

EWE: The whole thing?

AM: No. You want the whole thing?

EWE: Anything about you in here?

AM: No. Uh huh.

EWE: Huh?

AM: Uhn huh.

EWE: Anything about me?

AM: No. Have the DEQ guy KUARSKI (ph) in there. (Pause) I don't need it. You can have it if you want to. I'll let you have it but I'd like to get it back if I can. If you uh you wanna read it.

.(Pause in conversation)

AM: As long as you're not in there you don't care uhh Chief. (Chuckles). But some of the stuff it said, LARRY really, you Know ...

EWE: Come on strong.

AM: (Sighs). I'll tell you what you know, some of that, some of that stuff he, language he said was, uh, was something else.

(Pause)

EWE: A lot of loose tongues in here.

AM: So you really don't realize after you read one of these things what they can do, what they can't do.

(Pause)

**EWE: Where did you get this?**

**AM: Friend of a friend of a friend.**

**(Chuckles)**

(Pause)

AM: You want it you can have it. I really don't need it.

EWE: Huh?

AM: I really don't need it. You can have it if you want it.

EWE: I'll take it and I'll read it just for the hell of it.

It is also appropriate to consider crimes charged in an indictment when determin-

---

**52.** This tape and the corresponding transcript were introduced in connection with the Treasure Chest scheme. Andrew Martin was found guilty on charges related to this scheme.

**53.** Designated by the government during trial as transcript number 110.

ing use of an anonymous jury.[54] The crimes charged in the indictment in this case clearly suggest attempts to corrupt the legal system of selecting licenses under the laws and regulations of the State of Louisiana pertaining to riverboat gaming licenses. These matters may also be considered against all of the defendants. The allegations become even more relevant when the Court considers the number of persons associated with the defendants who have plead guilty to charges related to the indictment returned in this case.

In *United States v. Salvatore*,[55] the Fifth Circuit affirmed the trial court's consideration of a "current" investigation of jury tampering on the part of a co-defendant and consideration of the appellants' alleged involvement in a video poker conspiracy with two co-defendants who pleaded guilty to the conspiracy prior to empaneling an anonymous jury. The Fifth Circuit stated that these considerations established that the "appellants participated in a criminal enterprise and conspired with individuals having the capacity and willingness to interfere with the judicial process."[56] The same situation is presented in the present case with regard to Edwin Edwards, Stephen Edwards and Andrew Martin and their co-conspirators. In *Salvatore*, the Fifth Circuit said it was proper for the trial court to consider an ongoing investigation into possible jury tampering on the part of a co-defendant in support of using an anonymous jury. The evidence is even stronger in the present case. Here, an investigation resulted in two indictments being returned against Edwin Edwards for allegedly trying to engage in illegal wire tapping, witness tampering and engaging

in the other conduct alleged in the indictment in this case and in *United States v. Brown*. In addition, co-defendants and other persons have entered guilty pleas to charges related to those in the two cases. In addition, Stephen Edwards was charged with similar conduct in this case and a taped conversation revealed Andrew Martin's ability to obtain a transcript of a wiretap conversation that he was not entitled to have regarding an ongoing investigation. These allegations taken together with the allegations set forth in the affidavits pertaining to jury selection utilized by Edwin Edwards in the two Edwin Edwards trials conducted in the Eastern District of Louisiana clearly show that these defendants have the capacity, ability and willingness to interfere with the judicial process and witnesses.

In *United States v. Riggio*, the Fifth Circuit approved the trial court's consideration of facts indicating that the defendant "had been accused of jury tampering in a previous case" in support of empaneling an anonymous jury.[57] Thus, in the Fifth Circuit, a court may consider charges lodged outside of the pending criminal case in determining whether an anonymous jury is warranted. The Court in *Riggio* also held that evidence adduced at trial may be considered by the appellate court in determining the propriety of the trial court's decision.[58]

As noted earlier in this opinion, it is appropriate for the Court to consider the nature of the crimes charged in the indictment.[59] The defendants in the present case were accused of being part of a broad-based conspiracy to interfere with

54. *See, Riggio*, 70 F.3d at 336 (defendant accused of jury tampering in a previous case).

55. 110 F.3d at 1131.

56. 110 F.3d at 1144.

57. 70 F.3d at 338.

58. *See, Krout*, 66 F.3d at 1427 (citing *United States v. Wong*, 40 F.3d 1347, 1376–77 (2nd Cir.1994)). This is particularly important in

this case. As will be seen later in this opinion, the Court's concern about media coverage proved to be a valid concern. Furthermore, the tapes played during the trial also confirmed conclusions reached by the Court when it made the decision to empanel the jury and withhold the names, addresses and places of employment of the jurors.

59. *Riggio*, 70 F.3d at 340.

the lawful process established by the State of Louisiana for issuance of gaming licenses to operate riverboats in Louisiana.[60] All of the defendants except Ecotry Fuller[61] were charged as members of a criminal enterprise, the objective of which was to manipulate the lawful licensing process for riverboats in order to enrich themselves and their associates and family members. These allegations support the Court's finding that the defendants had a propensity or willingness to interfere with the lawful state licensing process. The fact that the jury found all of the defendants except Tarver and Fuller guilty of some of these charges only confirms the concern the Court had at the beginning of the trial about the defendants' ability and willingness to interfere with the licensing process.

In determining whether to empanel an anonymous jury, the Fifth Circuit has held that the court may also consider the potential that, if convicted, the defendants face lengthy incarceration and substantial monetary penalties. Such is the case pending before the Court. Under the indictment, the defendants were faced with the following maximum sentence of imprisonment and monetary fines and forfeiture: (1) Edwin Edwards: 350 years of imprisonment, a fine of $7,250,000.00, or both; the Court could also impose restitution and/or a forfeiture in the amount of $3,129,000.00; (2) Stephen Edwards: 300 years of imprisonment, a fine of $500,000.00, or both; the Court could also impose a restitution and/or forfeiture in the amount of $3,129,000.00; (3) Cecil Brown: 80 years of imprisonment, a fine of $1,000,000.00, or both; the Court could also impose a restitution and/or forfeiture in the amount of $2,425,000.00; (4) Andrew Martin: 120 years of imprisonment, a fine of $1,750,-

000.00, or both; the Court could also impose a restitution and/or forfeiture in the amount of $2,425,000.00; (5) Bobby Johnson: 75 years of imprisonment, a fine of $2,250,000.00, or both; (6) Gregory Tarver: 55 years of imprisonment, a fine of $2,750,-000.00, or both; and (7) Ecotry Fuller: 60 years of imprisonment, a fine of $3,000,-000.00, or both.

Thus, each defendant at the time the Court issued its original opinion faced substantial terms of imprisonment and staggering penalties and forfeitures. All but two of the defendants continue to face lengthy jail sentences, fines and forfeitures following the jury's verdict. The fact that some defendants were acquitted of all charges and other defendants were found not guilty on some counts does not change the analysis. In *Salvatore*, the Fifth Circuit held that the relevant inquiry is whether the defendants are initially facing potentially lengthy prison sentences and monumental financial penalties.[62]

The publicity and the emotional, political climate surrounding the trial are additional factors which the Court may and did consider in determining whether to empanel an anonymous jury. The Fifth Circuit acknowledged the existence of the extensive news coverage in its opinion affirming the Court's gag order in *U.S. v. Brown*.[63] Extensive publicity of these proceedings enhance the possibility that jurors' names would become public, thereby exposing them to possible intimidation and harassment.[64] This case has received extensive media coverage before, during and after the trial. This Court entered two standing orders pertaining to media coverage, reserved seating, credentials, a "bull pen" for interviews and reserved parking for media

**60.** Rec.Doc. No. 311 at 3 (Amended Joint Proposed Summary of Indictment) (emphasis supplied).

**61.** Ecotry Fuller and Greg Tarver were acquitted by the jury.

**62.** 110 F.3d at 1144.

**63.** See U.S. v. James Harvey Brown, 218 F.3d 415, 427 (5th Cir.2000).

**64.** *Salvatore*, 110 F.3d at 1143.

trucks on a closed lane of a public street.[65] This Court has outlined in other opinions the extensive procedures the Court was required to put in place to accommodate the numerous local and national media representatives who wanted to attend and cover the trial. The record also reflects the numerous motions filed by the press before, during and after trial seeking the names, addresses and places of employment of jurors. The media has also sought to obtain the juror questionnaires, all *in camera* hearings pertaining to jurors, and the entire sealed record. Courts have recognized that "[a] trial judge is usually well-aware of the ambience surrounding a criminal trial and the potential for juror apprehensions." [66] The Court's decision to withhold juror identifying information " 'requires a trial court to make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings.' " [67] The trial judge's assessment is given due deference by the appellate court. The evidence in this case not only reflects the Court's apprehension and concern, but the concern and apprehension of some jurors about being identified publicly.

Some background regarding the parties is appropriate and necessary for a full understanding of the facts surrounding media coverage and the emotional, political climate that existed herein. One of the defendants is Edwin Edwards, a four-term Governor of the State of Louisiana. It is easy to conclude that Edwin Edwards is a powerful, influential figure in Louisiana's political history. As a result, he is and has been the subject of intense media coverage during his political career. The current indictments only increased the media's interest in Edwin Edwards.

In 1985 and 1986, Edwin Edwards was tried in the Eastern District of Louisiana on charges relating to interfering with the lawful process of licensing for nursing homes. The first trial ended in a hung jury. The former governor was acquitted of all charges during the second trial. Both of these trials received national media attention. The indictment in this case and in *Brown* have also been the subject of intensive media and public interest as indicated by the news clippings set forth in the appendix.

Also named as a defendant in this case is the former governor's son, Stephen Edwards, who has also been the subject of extensive media coverage. Three of the former governor's associates, Andrew Martin, Bobby Johnson and Cecil Brown, are also included in the indictment. Finally, a powerful state senator and a member of the state gaming board were named as defendants. The potential witness list included Eddie DeBartolo, the former president of the San Francisco 49'ers professional football team and Super Bowl champions, and Cleo Fields, a former congressman and current state senator. Witnesses such as these increased the already extensive media attention and pre-trial coverage. This interest increased even more during the trial when Eddie DeBartolo and other members of his staff testified and during the playing of the video tape of a meeting between Senator Fields and Edwin Edwards. Indeed, the media interest continues today and there are now pending before the Court numerous media motions and requests seeking to copy the audio and video tapes played to the jury as well as other evidence, exhibits and pleadings. The media also filed a mandamus action against the Court in the Fifth Circuit on July 13, 2000 seeking this and other information.[68]

---

**65.** Rec.Doc. Nos. 47 and 292.

**66.** *United States v. Eufrasio,* 935 F.2d 553, 574 (3rd Cir.1991).

**67.** *Branch,* 91 F.3d at 723 (citing *United States v. Childress,* 58 F.3d 693, 702 (D.C.Cir. 1995)).

**68.** 5th Circuit Docket # 00–30702.

This trial was expected to last three months, but actually took longer because of illnesses of the parties and jurors and other factors. The trial began on January 10, 2000 and a verdict was returned on May 9, 2000. The media coverage was and is as extensive as the Court thought it would be at the time the Court granted the government's motion. "The prospect of intense publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment." [69]

During voir dire, many members of the jury panel expressed concerns about being identified. Many of the jurors who were picked to serve on the jury expressed similar concerns. After the jury returned its verdict, nine of the eleven members of the trial jury [70] requested the Court to advise the media that they did not wish to be contacted. [71] However, this is only the beginning and not the ending of the story regarding the media coverage of the jurors. When rendering its opinion granting the government's motion to empanel an anonymous jury, the Court was concerned about juror apprehension, intimidation and harassment by the media and other persons who were not even directly involved in the case, but who had strong feelings for or against parties and the charges.

In addition to concerns about the media coverage, other events involving third parties and their contacts with the jurors or allegations which occurred during the trial support the Court's decision herein. Despite the anonymity ordered by the Court, the media, upon learning the name of one juror, published the juror's name in the newspaper. [72] It seems highly likely that if the jurors were not given anonymity, there would have been widespread dissemination of their names, addresses and places of employment, thereby subjecting them to possible harassment or intimidation from the media and others. Indeed, this very thing happened during the trial as will be discussed later. The Court can only wonder what additional problems the Court and the jurors would have had if the names, addresses and places of employment of the jurors were made public. Following are a few examples of the problems the Court faced despite the numerous precautions taken by the Court.

For the convenience and protection of the jurors, the jurors reported to a location away from the courthouse where United States Marshals picked up the jurors and transported them to and from the courthouse each day. This procedure did not deter the press from attempting to locate where the jurors were parking their cars or from attempting to identify jurors presumably by obtaining their identity from license plate numbers on the jurors' cars. Some members of the media discovered the location where the jurors met and attempted to video tape and talk to some of the jurors. After the jury's verdict on the guilt and innocence phase of the trial, but prior to the final verdict on the issue of forfeiture and their discharge as jurors, some members of the media appeared at the homes of jurors to interview jurors presumably about their verdict.

During the voir dire, each juror was questioned individually in open court with the parties, public and media present. Newspaper articles were published about the answers given by the jurors. These detailed answers caused some jurors to be identified by co-workers, friends and others even though their names and places of employment were withheld from the parties, media and public. Jurors were also required to give their opinions about Edwin Edwards and the other defendants,

---

69. *Wong,* 40 F.3d at 1377 (citation omitted).

70. One juror was excused during deliberations. Under Rule 23 of the Federal Rules of Criminal Procedure, the jury was allowed to continue its deliberations with eleven jurors.

71. Rec.Doc. No. 1350.

72. The juror's name was known because he was employed as a reporter by that newspaper.

gambling, wiretaps, use of informants, plea bargains and people who dealt in large sums of cash. It was important for this jury to be able to express honest opinions about these and other questions without being concerned about harassment or other contact from the media or any other person. There was little, if anything the Court could do to prevent certain stories from being published. For example, although sealed to protect their identity, a list of 61 unindicted co-conspirators was published and widely disseminated by the media.[73] The Court's gag order did not seem to deter the press from seeking interviews of the defendants, attorneys or witnesses. This is not a criticism of the media's desire and right to cover this case in accordance with the rights guaranteed to the press under the Constitution and jurisprudence. It is, however, justification for trying to protect the identity of the jurors and free them from being questioned, harassed or otherwise bothered and intimidated during and after this lengthy trial.

The Court also believed it was important to shield the jurors from improper contact, harassment and possible influence from the general public and others. A cursory review of the answers given by the prospective jurors to questions set forth in the juror questionnaire reveals a good sample of the public's feelings about the parties and charges brought against the defendants. The emotional, political atmosphere that surrounded this case could not be avoided. No juror serving in a case where there is such high public interest as this case should have to be concerned about being contacted, influenced or harassed by the general public or anyone else. The Court concedes that not every case where there is extensive media interest justifies or requires an anonymous jury. But when, as in this case, a totality of the facts suggest the potential that the jurors will be exposed to intense media coverage that could lead to possible intimidation and harassment, an anonymous jury is necessary.

Despite the best efforts of the Court and the United States Marshal's Service, some individuals did attempt to cause problems for some jurors because of personal bias against a juror, personal relationships with the parties and other reasons. This caused the Court to conduct several hearings which required the jurors and in some cases, their families, to be questioned by the Court. The Court believes that the use of the anonymous jury prevented more of this type of conduct. The Court's decision to withhold the jurors' identities allowed the jury to concentrate on the evidence and proved to be a substantial deterrent to intentional or accidental contact and influence on the jury. This protection also lessened the prejudice which could arise from such actions, innocent though they may appear. The Court's action also ensured all of the parties a fair and impartial trial.

The Court cannot overlook the emotional, political atmosphere that surrounded this case. As noted earlier, Edwin W. Edwards was a four-term governor of Louisiana. A state senator and a member of the state gaming board were also named as defendants. Witnesses included a mayor, chairman of the gaming board and members of the former governor's staff. The potential witness list included many current and former political appointees and state employees. To "minimize the prejudicial effects of the pretrial publicity surrounding this trial and an emotional, political atmosphere that created a risk of jury intimidation and improper influence," [74] the Court withheld the names, addresses and places of employment of the jurors. The Court does not believe there were any other alternatives under the to-

---

**73.** The Court has been unable to determine how and from whom the reporter obtained this sealed document.

**74.** *United States v. Dakota,* 188 F.3d 663, 668 (6th Cir.1999).

tality of the facts in this case. The Sixth Circuit upheld similar action taken by the trial judge in *U.S. v. Dakota*,[75] The totality of the facts of this case create a similar, if not greater need for the Court's action than those set forth in *Dakota*.

Certain defendants have argued that because the government's evidence in support of an anonymous jury did not pertain to all of the defendants,[76] it would be unfair and prejudicial to require an anonymous jury for all of the defendants. This argument is without merit. The defendants are incorrect in their assessment of the evidence and the jurisprudence which the Court followed in reaching its decision. Furthermore, defendants' argument was rejected in *United States v. Ross*.[77] In *Ross*, the Eleventh Circuit stated that "[e]ven though the government did not prove that these incidents were related to Appellant or another co-conspirator, the court nevertheless properly considered them in establishing an anonymous jury."[78] What the defendants fail to acknowledge is the fact that six of the seven defendants in this case are charged as members of a criminal enterprise to manipulate the lawful state licensing process in order to enrich themselves and others via extortionate activities. Some of the alleged objectives of the enterprise include actions of the defendants: (1) to enrich the members of the enterprise as well as their associates, friends, families, and partners, through the illegal manipulation and corruption of the lawful system to award riverboat gaming licenses, in order to ensure that licenses would be awarded to those applicants supported by the enterprise; (2) to enrich the members of the enterprise [and related others] by extorting payments from riverboat license applicants, thus manipulating the lawful licensing process; (3)

to enrich the members of the enterprise [and related others] by ensuring that the gaming operations benefitting Edwin Edwards and the members of the enterprise would not be economically harmed or otherwise affected by adverse political action; (4) to secretly divide and launder the proceeds of the enterprise's racketeering activity; (5) to implement any means deemed necessary, including using, endeavoring to use, and procuring other persons to use illegal electronic wiretaps to intercept telephone communications of government agents and prosecutors, in order to corruptly formulate defenses and countermeasures to the government's investigation of the enterprise.[79] It is clear that the Court may consider the evidence pertaining to one co-conspirator against the other co-conspirators and members of the criminal enterprise when deciding whether to empanel an anonymous jury.

While Ecotry Fuller is not alleged to have been a member of the aforementioned criminal enterprise, he was charged in this case with perjury before a federal grand jury regarding his statements about the executive summary. The allegation that Mr. Fuller made false statements to a grand jury while under oath is indicative of a willingness to subvert the lawful judicial process.

It is also obvious that neither Gregory Tarver nor Ecotry Fuller were prejudiced by the Court's decision to grant the government's motion. Both were found not guilty on all charges brought against them. Furthermore, not guilty verdicts were returned on other charges and racketeering acts brought against some of the other defendants. It is clear that the jury gave very careful consideration to all of the evidence brought against each defendant and based their verdicts on the evidence

---

**75.** 188 F.3d at 663.

**76.** There is evidence relating directly to defendants Edwin Edwards, Stephen Edwards and Andrew Martin. There is also evidence related directly to persons associated with the defendants in this case.

**77.** 33 F.3d 1507 (11th Cir.1994).

**78.** 33 F.3d at 1521 n. 25 (citation omitted).

**79.** Rec.Doc. No. 306, pp. 8–10.

and not the fact that their names had not been disclosed. There was never any indication or suggestion made to the jury by the Court or any attorney involved in the case that the defendants were violent or dangerous. The Court's charge mentioned elsewhere in this opinion dispelled any suggestion that names of jurors were withheld because the defendants might physically harm the jurors or their families. The fact that numbers instead of names were used by the jurors did not prejudice the defendants or interfere with the jury's ability to fairly and impartially render a proper verdict herein.[80]

Judge Edith Brown Clement's decision in *United States v. Carollo*[81] supports the Court's decision to empanel an anonymous jury even when some of the evidence presented in support thereof does not directly relate to every defendant. After Judge Clement determined that the jury in *Carollo* would be anonymous, a number of the defendants moved for separate trials. These defendants argued that they would be unfairly prejudiced by the "decision because the jury will assume that all of the defendants are dangerous, whereas in reality the Court's decision to empanel an anonymous jury was based on the histories of only a few defendants."[82] The Court refused to grant separate trials, finding that the prejudice feared by the defendants could be cured by limiting instructions to the jury. This Court gave similar limiting instructions to the jury. Because of the verdicts rendered by the jury, it is obvious that the jury not only followed these instructions, but actually returned not guilty verdicts on all charges brought against two of the parties who were complaining of prejudice. The jury also found Edwin W. Edwards and Stephen Edwards not guilty on some charges and racketeering acts. It is apparent that the jury

followed the Court's limiting instructions on why numbers were used instead of names.

There is a consensus among all circuits that have considered the anonymous jury issue that once the decision to empanel an anonymous jury is made, the trial court must take appropriate action to ensure the parties are given adequate voir dire to allow the parties to have sufficient information to meaningfully exercise their challenges. The focus of the inquiry is whether the defendants were prejudiced in selecting an impartial jury because relevant and meaningful information was withheld from them. A common sense reading of the jurisprudence indicates that the mere disclosure of the name of a person is not particularly enlightening insofar as gleaning information about the biases, beliefs, prejudices and values of that person. As the record will reveal, the parties were provided with extensive information about each juror. There were only three things the parties did not know: the juror's name, specific address and specific place of employment. However, the parties did know in which parish and what zip code each juror currently lived and a history of prior places where the juror lived. The parties were also provided with extensive information about the juror's current and prior employment history. This information provided to the parties will be discussed in detail later in this opinion and it is also indicated on the juror questionnaire which is attached as an exhibit in the appendix of this opinion.

Numerous courts have upheld a trial court's decision to empanel an anonymous jury when extensive voir dire and answers to questionnaires are provided. The thrust of the inquiry is whether "measures are taken to inform a defendant of jury

---

**80.** This is particularly so given the substantial information given to parties about the jurors.

**81.** No. 94–158, 1995 WL 591322 at *2 (E.D.La. Aug.28, 1995) (not reported in F.Supp.) (court empaneled an anonymous

jury where the backgrounds of some of the defendants necessitated it, while the backgrounds of others did not).

**82.** 1995 WL 591322 at *1.

demographics and to permit ample voir dire," [83] so that a defendant's right to intelligently exercise peremptory challenges is not impaired. In *United States v. Branch*,[84] the Fifth Circuit held that there was no showing that refusing to release the names and addresses of the jury prejudiced the defendants' ability to select an impartial jury.[85] The defendants in *Branch* were furnished with answers to 80 detailed questions submitted to prospective jurors.[86]

█ In the present case, the parties were provided with an "arsenal of information" based upon the extensive questionnaires completed by potential jurors, as well as the Court's individual voir dire of potential jurors. Specifically, the parties were provided with answers to 116 detailed questions submitted to prospective jurors.[87] The final questionnaire utilized by the Court was compiled from questions submitted jointly by the parties. Copies of the completed questionnaires prepared by the 125 jurors who were summonsed for the trial were given to the parties several days prior to jury selection. This allowed

the parties ample time to review the completed questionnaires.[88] The government and the defendants also submitted follow-up questions they wished the Court to ask during individual voir dire. But for the name, address and place of employment, the parties were provided with a wealth of information as to each potential juror. This included information about the age, race, medical problems, economic and other hardships, residential history,[89] family history and marital status, number of children, current employment status, occupation, nature of the employer's business, length of employment, size of company where the juror worked, prior jobs, training and employment for federal, state or local governments, training in business, financial or accounting, prior business investments and whether the juror's employer ever did business with the state. The questionnaire also provided information regarding the juror's education, military experience and background information regarding the juror's spouse or partner. The jurors also provided information about their activities, including volunteer work, involvement in education, religious, profes-

---

83. *Eufrasio*, 935 F.2d at 574 (citing *Scarfo*, 850 F.2d at 1015).

84. 91 F.3d at 699.

85. 91 F.3d at 724.

86. *See also, Eufrasio*, 935 F.2d at 574 (anonymous jury is justified as long as defendants are afforded full voir dire); *Paccione*, 949 F.2d at 1192 (when anonymous jury is warranted, the defendant's fundamental right to an unbiased jury is adequately protected by the court's conduct of a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself); *United States v. Edmond*, 52 F.3d 1080, 1082 (D.C.Cir.1995) (voir dire was. more than adequate to compensate for the information denied by juror anonymity; it elicited information about the prospective jurors' habits, activities, work experiences, and families that was far more extensive and detailed than appellants might have drawn from jurors' mere names and addresses); *Wong*, 40 F.3d at 1377 (despite withholding of jurors' names, addresses, and employers, the court questioned prospective jurors about their familiarity with the case,

the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters; this "extensive voir dire adequately explored prospective jurors' bias" as to issues in the case and as to the defendants and "was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury."); *United States v. Crockett*, 979 F.2d 1204 (7th Cir. 1992) (names, addresses, and places of employment withheld, but district court conducted a "searching and thorough" voir dire).

87. A copy of the questionnaire is attached hereto.

88. Because Edwin Edwards was hospitalized during jury selection, the parties had additional time to study the completed questionnaires.

89. This included information whether the juror owned or rented a home or lived with others and how long and where in Louisiana the juror lived.

sional, political, or other union groups, and any leadership positions held. Jurors were required to disclose their political party affiliation and whether they considered themselves liberal, conservative, moderate or some other status. The jurors disclosed whether they or any member of their family had run, been elected· or appointed to public office, had contributed to or made gifts to political candidates or campaigns or worked in such campaigns. In addition to the above, the questionnaire required each juror to state how closely they followed Louisiana politics. Jurors set forth their religion, how often they attended church and whether there were any religious beliefs which prevented them from serving as a juror. Questions 57–71 asked jurors detailed information about gambling in Louisiana, religious beliefs regarding gambling and other knowledge about gambling laws, regulations, corruption in awarding riverboat licenses, any responsibility Edwin Edwards may have had for problems in the state gaming industry and opinions about people who deal in large sums of cash. Detailed questions were asked each juror about their prior jury service and their opinions of the court system.[90] Included in the questions about the court system were questions seeking the juror's opinions about plea agreements, use of informants, immunity and reduced sentences.

There were extensive questions directed to the jurors regarding any connections they had with the parties, attorneys and agents in this case. Questions were also asked about the media and pretrial publicity, opinions of jurors on the guilt or innocence of the defendants, the defendants' presumption of innocence and right to remain silent, the government's burden of proof beyond a reasonable doubt and the juror's obligation to follow the law as given by the judge. Finally, questions were asked of each juror whether they could serve in a fair and impartial manner. As will be noted later, jurors were then individually questioned during voir dire about the answers they gave in the questionnaire.

The Court summoned 125 jurors to appear on the first day of the trial. The Court began the voir dire by asking questions to the entire jury panel in a group after the jurors had been placed under oath. Then individual voir dire was conducted on each juror outside the presence of the other jurors. The parties were allowed to exhaust every appropriate question relevant to this case either via the written questionnaire and by suggesting questions during the voir dire process. The transcript of voir dire will consist of approximately 2,000 pages.[91] The Court took eight days to actually empanel the jury. After all questions were asked of the jurors, the Court allowed the parties considerable time to again review the questionnaires and the answers given by the jurors during voir dire before requiring the parties to exercise their challenges. A review of the answers given during voir dire and the answers to the juror questionnaires reveals the parties had more than ample information to use in deciding which jurors to select, challenge for cause or peremptorily strike. In short, the information provided to the United States and the defendants was far more extensive and detailed than the parties could have obtained by just knowing the name, address and place of employment of a juror. The information obtained from the questionnaire and the voir dire adequately explained any bias or prejudice a juror may have had against a defendant, the government, and on the issues involved in the case. This information permitted the parties, including the defendants, to meaningfully exercise their challenges and to obtain a fair, honest and impartial jury. The defendants' fundamental right to an unbiased jury was adequately protected by the

---

**90.** Questions 72–85.

**91.** Only 80 jurors were questioned individually before the Court obtained a sufficient pool to select the jury.

procedure used by the Court and the information provided by each juror.

■ This Court was cognizant of the defendants' constitutional rights to a presumption of innocence until proven guilty beyond a reasonable doubt. The Court was also aware that a neutral, plausible and nonprejudicial reason for anonymity must be provided to the jurors. Depending upon the particular case, these instructions should ordinarily include some of the following: (1) defendants are entitled to a presumption of innocence; (2) the case is one of high profile; (3) the jurors are to remain anonymous because of the publicity surrounding the case and the need to shield jurors from the possibility of extra-judicial communications;[92] (4) use of an anonymous jury ensures that there will be a fair trial for both sides;[93] (5) empaneling an anonymous jury in no way suggests that improper communications have been made by either side;[94] and (6) it is common practice in many cases in federal court to keep the names and identities of the jurors in confidence.[95]

The jurors in the present case were provided with neutral, nonprejudicial reasons for the Court's decision in order to protect the defendants' constitutional right to a fair trial. The Court gave the following instruction to the jury:

> You have been randomly selected to serve as a potential juror in the trial of United States versus Edwin W. Edwards, Stephen Edwards, Bobby Johnson, Andrew Martin, Cecil Brown, Gregory Tarver and Ecotry Fuller.

> This case has attracted a high degree of publicity. To protect your privacy during the jury selection process and trial, you have been assigned an individual juror number which will be used to identify you. You must use your juror number at all times. This procedure

has been followed in other highly publicized cases in federal court and is designed to protect the privacy of jurors during the course of the trial.

> With any potentially high profile case, we are all subject to receiving phone calls and letters about the case and even inquiries from members of the media or from friends, neighbors or relatives. I want to ensure that there not be any such contact with members of the jury during the course of this trial. I also want to protect the defendants as well as the government from any belief on the part of the jury that any such communications are coming from one side or the other. In other words, I do not want the defendants or the government to be characterized as anyone who would be sending communications to the jury or as someone who is trying to improperly influence the jury.

> The use of these procedures is to ensure that both sides will get a fair trial. It will also permit you the jury to perform your important duties without your privacy being invaded.

> You are also to remember that the defendants have entered not guilty pleas to the charges brought against them. Therefore, they are presumed innocent unless and until the government proves their guilt beyond a reasonable doubt.

> Therefore, as we proceed today and throughout the remaining days of this trial, you should only use your juror number to identify yourself. Do not use your or your spouse's name, home or business address or the name or address of your employers in responding to questions or otherwise communicating with the Court.

> Are there any members of the jury who would have any bias, prejudice or negative feelings toward the United States or the defendants because of the

---

**92.** *United States v. DeLuca,* 137 F.3d 24, 32 (1st Cir.1998).

**93.** *Salvatore,* 110 F.3d at 1144.

**94.** *Salvatore,* 110 F.3d at 1144.

**95.** *Edmond,* 52 F.3d at 1093.

Court's decision not to reveal your names to the public?

All jurors assured the Court that they had no bias, prejudice or negative feelings toward the United States or the defendants because of the use of an anonymous jury. In addition to giving the quoted charge, the Court set forth the following language in the first questionnaire submitted to the prospective jurors:

> This case has attracted a high degree of publicity. To protect your privacy during the jury selection process and trial, you have been assigned an individual juror number which will be used to identify you. Your juror number is located in the top right-hand corner of the first page of the attached juror questionnaire and on each page thereafter. The procedure used in this case has been followed in highly publicized cases and is designed to protect the privacy of jurors during the course of the trial.

Defendants argue that empaneling an anonymous jury in this case effectively establishes a new category of cases appropriate for that procedure. The Court disagrees. As noted earlier in this opinion, the Fifth Circuit in *United States v. Branch*[96] upheld impalement of an anonymous jury despite the fact that the defendants had no "ties to organized crime." After carefully considering the totality of the circumstances in this case, the Court concludes that empaneling an anonymous jury was necessary to protect the lawful administration of justice, ensure all parties a fair and impartial trial, protect the priva-

cy of the jurors and protect the jurors from undue harassment, intimidation, and inquiries.

This is not the first case where a court has empaneled an anonymous jury where the defendants had no ties to organized crime. In *United States v. Branch,*[97] *United States v. Talley*[98] and *United States v. Dakota*[99] the appellate court affirmed the impalement of an anonymous jury even though links to organized crime were absent. In fact, if there was a specific requirement that organized crime be present before the courts can approve an anonymous jury, the appellate courts would have clearly stated such. The *Branch* decision has been previously cited and discussed herein. In *United States v. Talley,* there was no evidence of any involvement by the defendant in a "criminal organization that included a pattern of violence," nor was there evidence that Talley had ever attempted to tamper with any previous juries.[100] There was evidence, however, of Talley's dangerous propensities to do so. The Court also believed that Talley's "many years of law enforcement experience provided him with the types of contacts that would enable him to tamper with the jury."[101] In the present case, it is clear that Edwin Edwards' sixteen years of service as Governor of Louisiana have provided him with similar kinds of contacts.[102] This fact is borne out by the affidavits submitted in conjunction with the anonymous jury issue regarding the manner in which the juries were selected during the 1985 and 1986 trials of Edwin

**96.** *See, Branch,* 91 F.3d 699.

**97.** 91 F.3d at 699.

**98.** 164 F.3d 989 (6th Cir.1999).

**99.** 188 F.3d 663 (6th Cir.1999).

**100.** 164 F.3d 989, 1002. (6th Cir.1999)

**101.** 164 F.3d at 1002.

**102.** The court in *Talley* further found that the defendant's current charge of attempting to

kill an F.B.I. agent in his case and a witness indicated that he had "already attempted to affect the judicial process." Although Mr. Edwards is not charged with attempting to kill an F.B.I. agent, he is charged with illegal wiretapping and counter surveillance of an F.B.I. agent in this case—evidence that he attempted to tamper with the lawful judicial process. He is also charged in *United States v. Brown* with tampering with a witness and bribing a judge.

Edwards.[103] It appears that co-workers or fellow union members of potential jurors were contacted.[104] According to the affidavits, the jury selection and research process was "organized and efficient" and involved more than 100 close supporters of the former governor. Political operatives contacted friends, neighbors and co-workers of potential jurors. Research on the jurors continued during the course of the trial. There is some indication that a sheriff and some of his associates may have assisted in the jury selection process.[105] Additionally, FBI Agent Hultz interviewed Colonel Paul Fontenot, who was the primary trooper in charge of guarding Edwin Edwards during the 1985 and 1986 trials. According to Agent Hultz, Colonel Fontenot, who was later named Commandant of the Louisiana State Police by Edwin Edwards, stated that during the previous trials, he was requested by members of Edwin Edwards' staff to perform records and license plate checks on various persons. Colonel Fontenot further stated that since the 1985 and 1986 trials, Stephen Edwards has requested him to perform background checks on various persons.

The statements contained in the affidavits submitted by all of the parties indicate the extensive resources which were and are available to Edwin Edwards to obtain information about jurors. It is also clear that during the prior trials, the defense team continued to receive information about the sitting jurors during the course of the trials. The defendants submitted some clarifying affidavits from some of the same persons from whom the FBI took statements. It is not necessary for the Court to resolve this conflict in the affidavits to a certainty. This evidence when combined with the other evidence considered by the Court strongly supports the Court's decision to withhold the names, addresses and places of employment of the jurors.

This Court can understand the need for gathering information about potential jurors in accordance with the local rules of court and the Federal Rules of Criminal Procedure to assist counsel in the selection of the jurors. However, once the trial jurors are seated, continuing research of the jurors creates the potential for prejudicial communications, innocent or otherwise, with a juror or a friend, family member or co-worker of a juror. Such contacts, though innocent in nature, can unduly influence a juror's decision. It is precisely this kind of communication, contact or influence which the Court in this case wished to avoid.

## CONCLUSION

It is important to note that the Court did not just rely on the affidavits submitted with the motion to support its decision to withhold the name, address and place of employment from the parties, media and public. The Court also considered: (1) the nature of the charges pending in this case and in *Brown;* (2) the defendants' past attempts to interfere with the judicial process or witnesses; (3) the potential lengthy jail sentences and substantial monetary penalties the defendants were facing, if convicted; (4) the extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation, influence and harassment; (5) the potential and actual contact by the media and other individuals with members of the jury panel while the trial was being held; (6) the emotional, political atmosphere of this case; (7) juror apprehension about being identified or interviewed; and (8) the totality of the circumstances in this case.

The Court believes that empaneling an anonymous jury was the only manner in which the Court could ensure that the jurors in this case were protected from outside influence and intimidation from

---

103. Rec.Doc. No. 1446.

104. Rec.Doc. No. 975.

105. Rec.Doc. No. 1449.

persons associated with the government, the defendants, the media, and individuals who had an interest for or against any of the parties or the jurors in this case.

The totality of all of the circumstances in this case establish a clear and actual need to withhold the names, addresses and places of employment of the jurors. The evidence which supports the Court's decision was clear at the time the Court made its initial decision to withhold the names, addresses and places of employment from the parties. The evidence presented at the trial, the media's actions and other events which occurred during and after the trial established an absolute need for a "partially anonymous jury" in this case.

The answers given by the jurors to the questionnaire and to questions asked during the voir dire gave the parties more than sufficient information for the parties to make an informed decision on which jurors to accept, challenge for cause or peremptorily challenge. The jury was properly instructed by the Court why their names, addresses and places of employment were withheld. Finally, the jury's verdict shows these parties were not prejudiced because numbers instead of names were used by the jurors.

For these reasons, the motion of the United States for an anonymous jury is and was GRANTED.

## APPENDIX A

Juror No. _____

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA
### CHIEF JUDGE FRANK J. POLOZOLA

UNITED STATES OF AMERICA CRIMINAL ACTION
VERUS NUMBER 98-165-B-M2
EDWIN W. EDWARDS, STEPHEN EDWARDS
CECIL BROWN, ANDREW MARTIN,
GREGORY TARVER, BOBBY JOHNSON,
ECOTRY FULLER

### JUROR QUESTIONNAIRE

In order to speed up the process of jury selection, a juror questionnaire has been prepared for you to complete. These questions should be answered by you and returned to the Clerk of the United States District Court for the Middle District of Louisiana in the enclosed envelope. **A response is required by December 17, 1999.** Do *not* place your name, address or place of employment anywhere on this questionnaire. Your name, address or place of employment should only be placed on the cover sheet attached to the questionnaire. Please place your signature on the cover sheet. Your answers will have the effect of a statement made under oath.

The questionnaire is designed to obtain information about your background as it relates to your possible service as a juror in this case. Its use will avoid the necessity of asking each prospective juror every one of these questions in open court, thereby substantially shortening the jury selection process.

All information contained in this questionnaire will be kept confidential. It will be reviewed only by the Court and by the attorneys on each side. Neither your identities nor your answers will be released to the general public or the media. You will be identified at trial only by your juror number.

Respond to each question as fully and completely as possible. Your complete candor and honesty is necessary so that both the prosecution and the defense will have a meaningful opportunity to select an appropriate jury. Your cooperation is of vital importance.

Juror No. _____

Because the questionnaire is part of the jury selection process, the questionnaires are to be answered under your oath as a prospective juror to tell the truth. You are instructed not to discuss this case or the questionnaire with anyone, including your family, friends, co-workers and fellow jurors. **You must complete the questionnaire yourself without consulting, talking to or seeking assistance from anyone.**

If you require additional space for your response or wish to make further comments regarding any of your answers, please use the additional blank pages attached to the back of your questionnaire. Please identify by number the question you are responding to on the blank page.

Please keep in mind that there are no "right" or "wrong" answers. Your answers will assist the Court and the parties in selecting an appropriate jury.

Please fill out the entire questionnaire. Do not leave any questions blank. If you are unable to answer a question or do not understand the question, please answer "do not know" or "do not understand" in the space after the question.

**PLEASE WRITE OR PRINT LEGIBLY. IF YOUR ANSWERS ARE ILLEGIBLE, YOU WILL BE REQUIRED TO RE-COPY YOUR ANSWERS.**

Thank you for your full cooperation. It is of vital importance to the Court that you return your completed questionnaire by **DECEMBER 17, 1999.**

1. Age: _____

2. Gender: _____Male _____Female

3. What is your race?
 _____ White
 _____ Hispanic/Latino
 _____ Black/African–American
 _____ Asian
 _____ Native American
 Other: _____

4. Do you have any difficulty reading, speaking, or understanding the English language?
 Yes _____ No _____

5. Do you speak or understand any languages in addition to English?
 _____ Yes What language(s): _____
 _____ No

6. Do you have:
 Any difficulty hearing Yes _____ No _____
 Any difficulty seeing Yes _____ No _____
 Primary responsibility for a young child, a disabled or elderly
 relative Yes _____ No _____
 Regular doctor's appointments for a chronic health problem Yes _____ No _____
 **IF YES,** please briefly explain: _____

7. Are you taking any medication on a regular basis? Yes _____ No _____
 **IF YES,** which ones: _____

**Please answer the following questions even if the Court has previously denied your request to be excused for hardship reasons. The Court will reconsider any request to be excused for hardship reasons.**

8. The Court estimates that the trial of this case may last 2–3 months. Do you have any personal problems or medical condition(s) which could affect your ability to serve as a juror in a trial of this length?

Juror No. _____
Yes _____ No _____

IF YES, please state the nature of the problem(s): _____

_____

_____

9. Jury service is one of the highest duties and privileges of a citizen of the United States. Mere inconvenience or the usual financial hardships of jury service will be insufficient to excuse a prospective juror. Jurors are paid $40.00 per day plus mileage expenses. Do you wish to apply to the Court to be excused on the ground that jury service would be a serious hardship?

Yes _____ No _____

IF YES, please briefly explain the hardship: _____

_____

10. Is there anything else of a personal or professional nature that might make it difficult for you to concentrate on this trial?

Yes _____ No _____

IF YES, please explain: _____

**Residential History**

11. City of residence: _____ Zip Code: _____

12. Do you: (check one)
 _____ Own your home
 _____ Rent your home
 _____ Live with other homeowners
 _____ Live with relatives, if so state relationship: _____

13. How long have you lived in Louisiana? _____ years
 Where else have you lived in Louisiana, and how long did you live there?

_____

_____

14. Please list the places outside Louisiana where you have lived and how long you have lived there:

_____

_____

15. Where were you born? _____

**Background/Family History**

**In answering questions 16–31 do not give the name or address of any employer or employer's business. If a question asks about an occupation, only provide a general description about the nature of that occupation. (For example: construction, A/C, plumbing, government, etc.)**

16. Marital status: (check one)
 _____ Single (never married)
 _____ Living with a partner for _____ years
 _____ Married for _____ years
 _____ Separated for _____ years; married for _____ years
 _____ Divorced for _____ years; married for _____ years
 _____ Widowed for _____ years; married for _____ years

17. If you have children, stepchildren or grandchildren, please list: (do *NOT* list names)

| Relationship | Age | Education | Occupation | Does he/she live with you? |
|---|---|---|---|---|
| | | | | |

Juror No. _____

_____

_____

_____

_____

## Employment

18. Current employment status (check **any and all** that apply):
 _____ Self-employed
 _____ Work full-time
 _____ Work part-time
 _____ Homemaker for _____ years
 _____ Student for _____ years
 _____ Disabled and unable to work for _____ years or _____ months
 _____ Unemployed/laid off for _____ years or _____ months
 _____ Retired for _____ years
 _____ Other: _____

19. What is or was your occupation? (If you are retired, unemployed, homemaker, or disabled, what was your last job?) Do *NOT* list name of employer or name of employer's business.

 _____

20. What are (were) your main responsibilities on your most recent job?

 _____

 _____

21. Please state the nature of your current or last employer's business (e.g.construction, A/C, plumbing, government, etc.) Do *NOT* list name of employer or name of employer's business.

 _____

22. Length of employment at current or last job: _____ (years) (months)

23. Do you work for a:
 _____ Small company (Less than 50 employees)
 _____ Large company (50 employees or more)
 _____ Self-employed Company name: _____
 _____ Government agency—Specify: _____
 _____ Other: _____

24. How satisfied are you with your current work situation?
 _____ Very satisfied
 _____ Somewhat satisfied
 _____ Somewhat dissatisfied
 _____ Very dissatisfied
 _____ Not working

25. Have you ever been laid off? Yes _____ No _____
 IF YES, please explain: _____

 _____

26. Do you supervise other people? Yes _____ No _____
 If yes, how many? _____
 Did you hire/fire others? Yes _____ No _____
 Describe your responsibilities: _____

 _____

27. Whether or not you are currently employed, please complete the following information for **previous** jobs and employers: (Do *NOT* include current job and Do *NOT* list name of employer or name of employer's business.)

Juror No. _____

Job Title or Kind of Work Length

_____
_____
_____
_____

28. Have you or anyone in your family ever had **training** or **employment** in the following:

| | | |
|---|---|---|
| Federal government | Yes _____ | No _____ |
| Internal Revenue Service | Yes _____ | No _____ |
| State government or legislature | Yes _____ | No _____ |
| Local government | Yes _____ | No _____ |
| Law enforcement (local, state, or federal) | Yes _____ | No _____ |
| Court system (local, state, or federal) | Yes _____ | No _____ |
| Law or law office | Yes _____ | No _____ |
| Gaming industry | Yes _____ | No _____ |

**IF YES TO ANY OF THE ABOVE,** please explain whether this is yourself or a relative, courses or job(s) held, and dates of employment:D

_____
_____

29. Have you taken any courses or had training in business, finance, or accounting?

 Yes _____ No _____

Please explain: _____

30. Have you ever owned or invested in a business?

 Yes _____ No _____

a. Are you still operating the business?

 Yes _____ No _____

IF NO, why not? _____

b. Please describe the business but do not give the name:

_____

c. Was this experience: (check one) _____ positive _____ negative _____ mixed
Please explain: _____

31. Have you or your employer ever done business or sought to do business with any state government agency?

 Yes _____ No _____

IF YES, please explain: _____

_____

a. Were you or your employer treated fairly by the state agency?

 Yes _____ No _____

b. Was this experience: (check one) _____ positive _____ negative _____ mixed
Please explain: _____

**Education**

32. What is the highest grade or degree you completed in school? _____
**If more than high school,** please fill in below:

| Dates | Area(s) of study/training | Degree/Certificate |
|---|---|---|
| | | |
| | | |

33. When you were in school, what was your:

Juror No. _____

Favorite Subject | Least Favorite Subject

_____ | _____

_____ | _____

## Military

34. Have you ever been in the military?

Yes _____ No _____

**IF YES,** which branch? What was your rank and dates of service, and what type of discharge did you receive?

_____

If you served in the military, please describe the types of jobs you had, any special training, including law enforcement or military courts, and the types of skills you acquired.

_____

## Your Spouse or Partner's Background

Please complete all of the following questions regarding your present spouse or non-married partner. If you are widowed, divorced, or separated, please complete all the following questions regarding your former spouse or partner.

35. What is your spouse's or partner's age? _____
36. Spouse or partner's current employment status (check **any and all** that apply):
 _____ Self-employed
 _____ Work full-time
 _____ Work part-time
 _____ Homemaker for _____ years
 _____ Student for _____ years
 _____ Disabled and unable to work for _____ years or _____ months
 _____ Unemployed for years _____ or months _____
 _____ Retired for _____ years
 _____ Other: _____

37. What is or was your spouse or partner's occupation? (If he/she is retired, unemployed, homemaker, or disabled, what was their last job?) Do *NOT* list name of employer or name of employer's business.

_____

38. What are (or were) your spouse or partner's duties and responsibilities: _____

_____

39. List the nature of your spouse or partner's current or last employer(s)' business (e.g., construction, plumbing, government, etc.). Do *NOT* list name of employer or name of employer's business.

_____

40. Length of **spouse/partner's** employment at current or last job: _____ years

41. What other types of work has he/she done? _____

_____

42. Was your spouse/partner ever laid off? Yes _____ No _____
 IF YES, please explain: _____

_____

43. What is the last grade or degree your spouse or partner completed in school?

_____

Juror No. _____

**If more than high school,** please fill in below:

| Dates | Area(s) of study/training | Degree/Certificate |
|---|---|---|
| | | |

## Activities

44. Have you ever done any volunteer work?

Yes ____ No ____

 **IF YES,** please describe: _____

45. Have you or your family been involved in any organizations, such as educational, religious, professional or political groups?

Yes ____ No ____

 **IF YES,** please explain: _____

46. Have you or has your spouse/partner ever belonged to a union?

Yes ____ No ____

 IF YES, who: Self ____ Spouse/Partner ____
 Dates of Membership: Self ____ to ____ Spouse/Partner ____ to ____

47. Have you ever held a leadership position in any organization?

Yes ____ No ____

 IF YES, please list the leadership positions you have held: _____

48. In terms of political party affiliation, are you a:
 ____ Democrat
 ____ Republican
 ____ Independent
 ____ Libertarian
 ____ Other: _____
 ____ None

49. Do you consider yourself to be politically:
 ____ Extremely Liberal
 ____ Liberal
 ____ Moderate
 ____ Conservative
 ____ Extremely Conservative
 ____ None of the above

50. Have you, or anyone close to you, ever run for, been appointed or been elected to serve in any public office or governing board, such as a school board or police jury?

Yes ____ No ____

 IF YES, please explain: _____

51. Have you ever given a gift to a public official or contributed money or made a loan to a political candidate or campaign?

Yes ____ No ____

 IF YES, please explain: _____

52. Have you ever worked in the field of politics or donated your time to work on the campaign of a political candidate?

Yes ____ No ____

 IF YES, please explain: _____

Juror No. _____

53. How closely would you say you follow Louisiana state politics?
_____ Follow very closely
_____ Follow somewhat closely
_____ Follow rarely
_____ Do not follow at all

54. What is your religion?
_____ No preference
_____ Baptist
_____ Protestant
_____ Catholic
_____ Jewish
_____ Other: _____

55. Approximately how often do you attend church or religious services?
_____ Never
_____ Rarely
_____ Several times a year
_____ Once a month
_____ Several times a month
_____ Once a week
_____ Several times a week

56. Is there anything in your religion or personal beliefs which would prevent you from sitting as a juror, in judgment of the guilt or innocence of another person, or following the law given to you by the Court?

Yes _____ No _____

**Gambling**

57. How do you feel generally about legalized gambling in Louisiana?
_____ Approve
_____ Disapprove
_____ No opinion

58. Does your church or religious organization have a position on gambling?
_____ Yes, it is against gambling.
_____ Yes, it is **not** against gambling.
_____ No, my church has no opinion on gambling.
_____ Don't know.
_____ Not applicable.
**IF YES,** do **you** agree with your church's position?

Yes _____ No _____

59. Do you have any moral or personal opposition to legalized gambling?

Yes _____ No _____

IF YES, please explain: _____

60. Do or did you support the campaign to reform or repeal the state gaming laws?

Yes _____ No _____

61. Are you specifically opposed to any of the following:

| | | |
|---|---|---|
| Riverboat gambling | Yes _____ | No _____ |
| Casino gambling | Yes _____ | No _____ |
| Video poker | Yes _____ | No _____ |

62. Have you or has anyone close to you ever had an interest in or investment with any companies or person involved in the ownership of gaming operations?

Yes _____ No _____

**IF YES,** please describe: _____

_____

63. Do you know anyone who has had any contact with the Louisiana State Police Riverboat Gaming Division?

Yes _____ No _____

**IF YES,** please explain: _____

_____

_____

64. Do you know anyone who now works or has worked in the gaming industry?

Yes _____ No _____

**IF YES,** please explain in what job(s), when, and where he/she is employed:

_____

65. Have you read, seen, or heard any news reports regarding regulation of the gaming industry in Louisiana?

Yes _____ No _____

IF YES, what have you read, seen, or heard? _____

_____

66. Do you believe that the citizens of Louisiana should have more influence over how gambling is regulated in the state?
 _____ Agree strongly
 _____ Agree somewhat
 _____ Disagree somewhat
 _____ Disagree strongly
 _____ No opinion

67. Do you believe that a person who is connected with the gaming industry is more likely to violate the law than one who is not connected with the legalized gambling industry?
 _____ Agree strongly
 _____ Agree somewhat
 _____ Disagree somewhat
 _____ Disagree strongly
 _____ No opinion

68. Do you believe that the gaming industry is necessary to Louisiana's economy?
 _____ Agree strongly
 _____ Agree somewhat
 _____ Disagree somewhat
 _____ Disagree strongly
 _____ No opinion

69. Do you believe there has been corruption in the awarding of Louisiana riverboat gaming licenses?
 _____ Agree strongly
 _____ Agree somewhat
 _____ Disagree somewhat
 _____ Disagree strongly
 _____ No opinion

70. Do you believe former Governor Edwards is responsible for previous or current problems in the state's gaming industry?
 _____ Agree strongly
 _____ Agree somewhat
 _____ Disagree somewhat
 _____ Disagree strongly
 _____ No opinion

Juror No. _____

71. Do you believe that anyone who deals in large sums of cash is probably engaged in criminal activity?
 ____ Agree strongly
 ____ Agree somewhat
 ____ Disagree somewhat
 ____ Disagree strongly
 ____ No opinion

**Jury Service/Experience and Opinions about the Court System**

72. Have you ever served on a jury? Yes ____ No ____
 IF YES, please complete the following for each case on which you served:

| Civil or Criminal | Charges or Allegations | When | Where | Was a verdict reached? If no, why not? | Verdict | Were you the Foreperson? |
|---|---|---|---|---|---|---|
| | | | | | | |

73. Do you believe everyone should be treated equally under the law?
 ____ Agree strongly
 ____ Agree somewhat
 ____ Disagree somewhat
 ____ Disagree strongly

74. Do you believe the police are very thorough and accurate in their usual investigations?
 ____ Agree strongly
 ____ Agree somewhat
 ____ Disagree somewhat
 ____ Disagree strongly

75. Have you or your family been the victim of wrongdoing by others (whether or not criminal charges were filed)?
 Yes ____ No ____
 **IF YES,** please describe: _____
 _____
 _____

76. Have you ever testified as a witness in a trial?
 Yes ____ No ____
 Please explain: _____
 _____

77. Have you or has a family member ever been involved in a lawsuit or legal action of any kind?
 Yes ____ No ____
 Please explain: _____
 _____

78. Have you ever accused someone or been accused of dishonest practices or activities?
 Yes ____ No ____
 IF YES, please explain: _____
 _____
 _____

79. Do you know anyone (including an employer) who has been charged or convicted of a crime or been involved in a criminal investigation?
 Yes ____ No ____
 IF YES, please explain: _____
 _____
 _____

80. Have you or anyone close to you ever been treated unfairly by any branch of government?

Yes _____ No _____

IF YES, please identify the government agency and explain what happened.

_____

_____

81. Have you or has a close family member or friend ever served time in jail or prison?

Yes _____ No _____

a. Please explain who, when, how long, and the nature of the charge(s):

_____

_____

_____

b. Did you or that person apply for a pardon?

Yes _____ No _____

Please explain who applied, when, and the outcome: _____

_____

82. Do you know anyone who agreed to cooperate with the prosecution in a criminal case in order to get a reduced sentence or immunity?

Yes _____ No _____

IF YES, please explain: _____

_____

83. Some of the government's witnesses in this case are testifying as part of plea bargaining agreements or under a grant of immunity from prosecution. What is your opinion about the use of plea agreements or granting immunity for this purpose?

_____ Approve
_____ Disapprove
_____ No opinion

Please explain your answer: _____

_____

84. What is your opinion regarding law enforcement's use of Court authorized telephone wire taps in conducting an investigation?

_____ Approve
_____ Disapprove
_____ No opinion

Please explain your answer: _____

_____

85. What is your opinion regarding law enforcement's use of informants in gathering information relating to possible criminal violations of the law?

_____ Approve
_____ Disapprove
_____ No opinion

Please explain your answer: _____

_____

## Connections with Parties to this Case

86. Do you or does anyone close to you know or have any connection with any of the prosecutors in the case: Eddie Jordan, Jr., Jim Letten, Michael Magner, Peter Strasser, Fred Harper, or Todd Greenberg?

Yes _____ No _____

IF YES, what is the connection and whom is it between? _____

_____

_____

87. Have you or has anyone close to you had any contact with Judge Polozola or his staff?

Juror No. _____

Yes ____ No ____

**IF YES,** please explain: _____

_____

88. Do you know anyone who is or was associated with any of the United States Attorney's offices in Louisiana, the U.S. Department of Justice, or the F.B.I.?

Yes ____ No ____

**IF YES,** what was the association and what is your relationship? _____

_____

_____

89. Do you or does anyone close to you know of or have any connection with any of the following defense lawyers: Dan Small, Jim Cole, Pat Fanning, Sonny Garcia, Mary Olive Pierson, Hillar Moore, Rebecca Hudsmith, Craig Smith, William Jeffress, James Heavner, Ernest Johnson?

Yes ____ No ____

**IF YES,** what is the connection and whom is it between? _____

_____

_____

90. Do you or does anyone close to you know or have any connection with any of the defendants in this case: former Governor Edwin Edwards, Stephen Edwards, Cecil Brown, Senator Greg Tarver, Andrew Martin, Bobby Johnson or Ecotry Fuller?

Yes ____ No ____

**IF YES,** what is the connection and whom is it between? _____

_____

_____

91. Former Governor Edwin Edwards was previously tried and found not guilty of federal charges in 1986 in a separate case. Would your opinion of the verdict (in the prior case) make it difficult for you to sit as a fair and impartial juror in this case?

Yes ____ No ____ Not sure ____

**IF YES OR NOT SURE,** please explain: _____

_____

92. Would your current opinion about former Governor Edwards make it difficult for you to be a fair and impartial juror in this case?

Yes ____ No ____ Not sure ____

93. Do you think former state officials (no longer in office) should be allowed to provide services to companies doing business with, or regulated by, the state?

Yes ____ No ____

94. Do you think that a **current** state official's family members should be allowed to provide services to companies doing business with or regulated by the state?

Yes ____ No ____

**Media**

95. Do you read a daily newspaper?

Yes ____ No ____

Which one(s)? _____

96. What other magazines and newspapers do you read on a regular basis?

_____

97. What radio and television programs do you enjoy?

TV: _____

Radio: _____

98. Have you followed news accounts of any trials in the news?

Yes ____ No ____

Juror No. _____

IF YES, please explain: _____

99. Do you or have you ever had a bumper sticker on your car?

Yes _____ No _____

IF YES, what does or did it say? _____

## Pretrial Publicity

Because this case has received publicity, you have probably seen, read, or heard something about this case either in the media or from friends, relatives, or co-workers. It is important that you carefully and completely answer the following questions concerning what you have learned about the case. There are no right or wrong answers. Please be as candid as possible.

100. a. Briefly tell what information you have read, seen, or heard about the case, the defendants, or their attorneys:

_____

_____

_____

_____

_____

b. What have you read, seen, or heard about the government's investigation, the federal prosecutors, or government witnesses?

_____

_____

_____

_____

_____

101. From which source(s) have you heard, read, or seen anything about this case? (Check **any and all** that apply)
_____ TV news
_____ Radio
_____ Newspapers
_____ Magazines
_____ Internet
_____ Word of mouth
Other: _____

102. Approximately how many media (television, newspaper, magazine, and radio) reports in total have you seen, read, or heard about this case?
_____ None
_____ 1 – 5
_____ 6 – 10
_____ 11 – 20
_____ 21 – 30
_____ 31 – 50
_____ 51 – 75
_____ 75 – 100
_____ 101 – 200
_____ More than 200

103. Have you heard others express opinions about this case or about any of the defendants?

Yes _____ No _____

IF YES, what opinions were expressed? _____

_____

_____

Juror No. _____

104. Have you personally met or do you have any knowledge of anyone associated with this case?

Yes _____ No _____

IF YES, please list who they are and how you know them: _____

_____

105. Have you formed any opinion about the case or about any of the defendants?

Yes _____ No _____

IF YES, (a) what is your opinion? _____

_____

(b) would you be able to set aside your current opinion and base your verdict on the law and evidence in this case? _____

106. Every defendant is presumed innocent and cannot be convicted unless the jury, based solely on all the evidence in this case, unanimously decides that his guilt has been proven beyond a reasonable doubt. The burden of proving guilt rests entirely with the government. The defendants have no burden of proof at all. Would you have any difficulty following these rules?

Yes _____ No _____

107. If, as a juror, you determine that the government has proven a defendant guilty of a charged offense beyond a reasonable doubt, would you be able to vote in favor of a guilty verdict?

Yes _____ No _____

108. Conversely, if, as a juror, you believe that the government has failed to carry its burden of proving a defendant guilty of a charged offense beyond a reasonable doubt, would you be able to vote for a verdict of not guilty?

Yes _____ No _____

109. Do you believe that a defendant in a criminal trial should be required to testify?

_____ Agree
_____ Disagree

IF AGREE: the judge will instruct you that:
a. a defendant in a criminal trial has no obligation to testify;
b. jurors cannot draw any conclusion from the fact that a defendant chooses not to testify; and
c. that the fact that a defendant chooses not to testify cannot be a factor in reaching your verdict.

Would you have any problem following those instructions if a defendant chooses not to testify?

Yes _____ · No _____

IF YES, please explain: _____

110. Would you be more likely to believe a law enforcement officer or other government agent than any other witness?

Yes _____ No _____ Treat all the same _____

111. You as a juror must follow the law as given to you by the Judge whether you agree with it or not. Would you have any difficulty following this rule?

Yes _____ No _____

112. The indictment in this case is an accusation and not evidence of guilt. Would you have any difficulty treating the indictment as an accusation and not as evidence of guilt?

Yes _____ No _____

Juror No. _____

113. There are seven defendants in this case. Each defendant and each charge must be considered separately. You cannot find a defendant guilty on any count unless the government has proven his guilt on that count beyond a reasonable doubt. You must not draw any conclusion from the fact that the defendants are on trial together, and you must not find one defendant guilty by reason of your finding another defendant guilty. Would you have difficulty following these rules?

Yes _____ No _____

114. Do you know of any reason why you could not fairly and impartially decide in accordance with your oath and based solely on the law and evidence, whether the government has proved a defendant's guilt beyond a reasonable doubt?

Yes _____ No _____

IF YES, what is the reason? _____

_____

_____

## Conclusion

115. Is there any matter not covered by this questionnaire that you think the attorneys or court might want to know about when considering you as a juror in this case?

Yes _____ No _____

Please explain: _____

_____

_____

_____

116. Is there any matter not covered by this questionnaire that may affect your ability to reach a fair and impartial verdict?

Yes _____ No _____

IF YES, please explain: _____